# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*Dearborn Maple Venture, LLC v. SCI Illinois Services, Inc.*, 2012 IL App (1st) 103513

| | |
|---|---|
| Appellate Court Caption | DEARBORN MAPLE VENTURE, LLC, Plaintiff and Counterdefendant-Appellant, v. SCI ILLINOIS SERVICES, INC., Defendant and Counterplaintiff and Third-Party Plaintiff-Appellee (JDL Development Interests, LLC, and 1035 N. Dearborn, LLC, Third-Party Defendants-Appellants). |
| District & No. | First District, Second Division <br> Docket No. 1-10-3513 |
| Filed | April 24, 2012 |
| Rehearing denied | May 23, 2012 |
| Modified on denial of rehearing | May 29, 2012 |
| Held <br> (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from a three-part agreement between the parties under which the third-party plaintiff sold property containing its existing funeral business to third-party defendant and third-party defendant was to build a residential condominium building on part of the property, a new funeral home on the rest and then convey the new funeral home to third-party plaintiff, the trial court's holding that third-party defendant was liable for an "additional sales price" pursuant to the earnest money contract based on the size of the condominium building was affirmed, but the calculation of damages was vacated and the cause was remanded for recalculation to take into consideration a change in the gross buildable area as a result of a zoning change. |

| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CH-19373; the Hon. Nancy J. Arnold, Judge, presiding. |
|---|---|
| Judgment | Affirmed in part and vacated in part; cause remanded with directions. |
| Counsel on Appeal | Edwards, Wildman, Palmer, LLP, of Chicago (Michael Dockterman, Peter N. Moore, and Nellie L. Viner, of counsel), for appellants. |
| | Valorem Law Group, LLC, of Chicago (Patrick J. Lamb and Nicole Nehama Auerbach, of counsel), for appellee. |
| Panel | JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion. Justices Connors and Harris concurred in the judgment and opinion. |

**OPINION**

¶ 1 Following a bench trial in the circuit court of Cook County, the trial court entered judgment in favor of the defendant-appellee, SCI Illinois Services, Inc. (SCI), and against the plaintiff-appellant, Dearborn Maple Venture, LLC (DMV), and the third-party defendants-appellants, JDL Development Interests, LLC (JDL), and 1035 N. Dearborn, LLC (1035 LLC), in the amount of $1,757,703, plus costs. On appeal, DMV, JDL and 1035 LLC argue that: (1) SCI's first amended counterclaim against them was collaterally estopped by a prior arbitration award; (2) SCI did not have a separate claim under the parties' executed "Earnest Money Contract"; (3) the trial court erred in entering judgment against 1035 LLC; and (4) the trial court miscalculated the damages pursuant to the terms of the parties' agreements. For the following reasons, we affirm in part the judgment of the circuit court of Cook County and vacate the award of damages and remand for further proceedings consistent with this opinion.

¶ 2 BACKGROUND

¶ 3 SCI was an Illinois corporation engaged in the business of owning and operating funeral homes. In 2000, SCI owned a parcel of real estate, along with its onsite funeral home, at 1035 North Dearborn Street in Chicago, Illinois (the property).

¶ 4 In October 2000, SCI decided to sell the property to a developer, JDL, on the condition

that aside from constructing a high-rise building on the property, JDL would also demolish the existing funeral home on the property, build a new funeral home in its place and convey the new funeral home back to SCI in fee simple. After negotiations began, the city of Chicago rezoned the property such that the maximum "floor area ratio" (FAR) permitted to be built on the property was reduced from an FAR of 12.0 to 5.0. In connection with this redevelopment project, SCI's vice president, Michael Decell (Decell), and JDL's president and sole owner, James Letchinger (Letchinger), executed three agreements: the "Development Agreement," an "Earnest Money Contract" and the "West Maple Lease Agreement" (lease agreement).

¶ 5        The development agreement set forth the details of the redevelopment of the property. Specifically, it described the redevelopment as a two-part project, which was comprised of the construction of a new funeral home and the construction of a high-rise residential condominium building. The development agreement specified the size of the new funeral home, which shall be completed "within thirty (30) months after the [c]losing," and required the high-rise residential condominium to consist of "no greater than 77,895 square feet of gross buildable area." The opening paragraphs of the development agreement expressly stated that the parties "simultaneously" executed the earnest money contract and the lease agreement, which provided for the sale of the property from SCI to JDL and provided for the temporary relocation of SCI's funeral business to a nearby property, respectively. Paragraph 1(g) of the development agreement required JDL to deliver a "letter of credit" in the amount of $3.5 million to SCI at closing, in order to ensure JDL's "[full performance of] its agreements set out herein and in the other agreements between the parties referred to herein." Paragraph 5 provided that in the event of a breach of or default on any terms of "this [a]greement," the face amount of the letter of credit shall become immediately due and payable to SCI, and that JDL "shall be released from all obligations hereunder to convey [the new funeral home] to SCI and SCI shall have no other or further claim or cause of action against JDL under this [a]greement." Under paragraph 9, all disputes, except equitable claims, between the parties "arising under this [a]greement or in any other agreement or document executed *** by the parties in connection with the transactions contemplated hereby" shall be solved by binding arbitration. The development agreement further stated, in paragraph 11(a), that "this [a]greement when executed and delivered, and the [d]ocuments referred to herein, collectively constitute the entire agreement of the parties with respect to the subject matter hereof."

¶ 6        The earnest money contract set forth the terms of the sale of the property. Under paragraph 1, SCI agreed to sell the property to JDL for $4 million and that JDL shall pay SCI an "additional sales price" in an amount "equal to [$51.35] times the number of square feet of gross buildable area in excess of [77,895 square feet] for which [JDL], its successors or assigns, obtain the requisite governmental approvals and which is available to [JDL], its successors and assigns, to build out, or which is in fact built out, at any time prior to December 31, 2010." The earnest money contract expressly stated that paragraph 1 "shall survive [c]losing."

¶ 7        The lease agreement was executed by JDL and SCI whereby JDL agreed to lease the premises at 12 West Maple Street in Chicago as a temporary location for SCI to continue the

operation of its funeral business while the new funeral home was being constructed by JDL on the property at issue.

¶ 8    In December 2000, near the time of closing, JDL and DMV entered into an assignment agreement by which JDL assigned its rights and obligations under the development agreement and earnest money contract to DMV. DMV was an Illinois limited liability company whose sole member was Letchinger. Letchinger, in his capacity as the sole owner for both JDL and DMV, was the only signatory to the assignment agreement. It is undisputed that in December 2000, SCI transferred the property to DMV.

¶ 9    In June 2003, JDL and DMV failed to construct and convey the new funeral home back to SCI to meet the time deadline directed by the development agreement. This failure to meet the time deadline was allegedly as a result of the collapse of the real estate market. On July 3, 2003, SCI drew upon the entire amount of the letter of credit and, as a result, received $3.5 million. Thereafter, DMV challenged SCI's actions and filed a demand for arbitration. It is undisputed that on May 24, 2004, DMV transferred the property to 1035 LLC. At that time, Letchinger held a majority ownership interest in 1035 LLC and served as its sole manager. It is also undisputed that in August 2004, the city of Chicago again rezoned the property such that the maximum FAR permitted to be built on the property increased to an FAR of 5.8. In 2006, the development of the high-rise residential condominium was completed on the property.

¶ 10   On April 2, 2007, SCI made a demand on JDL for the "additional sales price" under paragraph 1 of the earnest money contract. Thereafter, JDL, DMV and 1035 LLC all refused to make any additional payment to SCI for the purchase price of the property.

¶ 11   In October 2007,[1] an arbitration hearing was held regarding SCI's actions of drawing upon the entire amount of the letter of credit in July 2003. The issue of SCI's 2007 demand for an "additional sales price" under the terms of the earnest money contract was not the subject of the arbitration. On January 22, 2008, in a written arbitration award, the arbitrator found that SCI was uncooperative with JDL and DMV in finding a solution to the issues surrounding the delay of constructing the new funeral home, that SCI unreasonably and incorrectly assumed that it did not need to provide JDL and DMV with an extension of time for this construction, and that SCI wrongly concluded that, under the circumstances, it could simply rescind the development agreement and take the entire $3.5 million pursuant to the letter of credit. The arbitrator further determined that JDL and DMV's delay in completing construction of the new funeral home by June 2003 was a material breach of the parties' development agreement, that the $3.5 million letter of credit did not constitute a valid and enforceable liquidated damage for the breach committed by JDL and DMV, and that the actual damages for the breach was $2,118,809 ($1,729,640 plus interest)–which was measured by putting SCI in the same position it would have been in had the development agreement never been executed, namely, by calculating what extra amount of money SCI

---

[1]DMV, JDL and 1035 LLC represent to this court in their joint brief on appeal that the arbitration hearing was held in October 2007, which is unclear in the record before us. However, SCI does not dispute the accuracy of this time frame.

would have received from JDL had it sold the *entire* property to JDL in October 2000 without the condition that a new funeral home be built on the property and reconveyed to SCI. Because SCI had improperly drawn upon the entire amount of $3.5 million pursuant to the letter of credit, the arbitrator held that the excess funds of $1,950,932 ($1,381,191, plus 9% interest in the amount of $569,741), must be returned to JDL and DMV.

¶ 12    On June 30, 2008, the arbitration award was confirmed by the circuit court of Cook County.[2] On July 16, 2008, SCI paid JDL and DMV the excess funds in satisfaction of the arbitration award.

¶ 13    On July 23, 2008, as a result of SCI's demand for additional payment pursuant to the "additional sales price" provision under paragraph 1 of the earnest money contract, DMV filed a complaint against SCI, which sought a declaratory judgment from the trial court regarding the parties' rights and obligations under this provision.

¶ 14    On August 31, 2007, SCI filed a counterclaim against DMV, which also named JDL as a third-party defendant. The counterclaim alleged that JDL and DMV breached the earnest money contract by failing to pay SCI an "additional sales price" pursuant to paragraph 1 of the earnest money contract for each square footage in the completed high-rise residential condominium on the property that exceeded 77,895 square feet. It further alleged that the total size of the high-rise residential condominium surpassed 77,895 square feet by at least 49,885 square feet and requested that it be awarded damages in the amount of at least $2,561,594.75.

¶ 15    On March 24, 2009, DMV filed a first amended complaint against SCI, seeking a declaratory judgment from the trial court that SCI's act of claiming and receiving the $3.5 million from the letter of credit released DMV from any and all obligations to SCI; that SCI waived any and all further claims or causes of action against DMV as a result of SCI's wrongful conduct in claiming and receiving the $3.5 million pursuant to the letter of credit; and that SCI was not entitled to any additional payment from DMV or any of its successors or assigns.

¶ 16    On October 22, 2009, SCI filed a first amended counterclaim, which additionally named 1035 LLC as a third-party defendant. The breach of contract claim (count I) in the first amended counterclaim substantially mirrored the breach of contract claim in the original counterclaim, except that it requested damages "in an amount in excess of $1,761,921.20." The first amended counterclaim added a successor liability claim (count II), which alleged that 1035 LLC was jointly and severally liable for the "additional sales price" owed to SCI.

¶ 17    In June 2010, a bench trial was held during which several witnesses testified. In a written opinion dated September 17, 2010, the trial court entered judgment against DMV on its first amended complaint, entered judgment in favor of SCI and against DMV, JDL and 1035 LLC on both counts of SCI's first amended counterclaim, in the amount of $1,757,703, plus costs. Specifically, the trial court found that the rights of the parties with regard to the failure of JDL and DMV to complete the construction and conveyance of a new funeral home to SCI by the time prescribed in the development agreement had been resolved by arbitration;

---

[2]Case Nos. 03 CH 7330 and 03 L 7389.

however, whether SCI was still owed "the full purchase price for the entire property [was] a separate matter" to be determined by the trial court. The trial court noted that the earnest money contract provided for a "retroactively determined purchase price" which was dependent on favorable zoning changes by the city of Chicago that were anticipated by the parties. It further stated that the letter of credit provision under paragraph 5 of the development agreement, "calling for one which by its own terms expired in August 2003, could have no bearing on the later events expressly anticipated by the parties in their separate [e]arnest [m]oney [c]ontract." The trial court then found that the release provision under paragraph 5 of the development agreement could not be construed to negate the obligation for an additional sales price under paragraph 1 of the earnest money contract.

¶ 18     On October 22, 2010, the trial court denied JDL, DMV and 1035 LLC's motion to reconsider its September 17, 2010 order. On November 22, 2010, JDL, DMV and 1035 LLC filed a notice of appeal before this court.

¶ 19                                                     ANALYSIS

¶ 20     We determine the following issues: (1) whether the doctrine of collateral estoppel applied to bar SCI's first amended counterclaim against DMV, JDL and 1035 LLC; (2) whether SCI could maintain a separate claim for an "additional sales price" under the terms of the earnest money contract; (3) whether the trial court erred in entering judgment against 1035 LLC; and (4) whether the trial court miscalculated the damages pursuant to the terms of the parties' agreements.

¶ 21     We first determine whether the doctrine of collateral estoppel applied to bar SCI's first amended counterclaim against DMV, JDL and 1035 LLC, which we review *de novo*. *Hope Clinic for Women, Ltd. v. Adams*, 2011 IL App (1st) 101463, ¶ 69.

¶ 22     DMV, JDL and 1035 LLC[3] argue that SCI's first amended counterclaim for an "additional sales price" under the terms of the earnest money contract was collaterally estopped by the arbitrator's findings in the January 2008 arbitration award. Specifically, they contend that the arbitration award had a preclusive effect on SCI's claim for additional payments because the arbitrator found that the development agreement, earnest money contract and the lease agreement "collectively set forth the terms of the transaction pursuant to which the [p]roperty was sold by SCI to JDL." Thus, because the arbitrator had determined that SCI had rescinded the development agreement, and had made SCI whole by returning it to a position it would have occupied had SCI sold the property outright, SCI was no longer entitled to any contractual damages under the earnest money contract. Further, they argue that the trial court's finding that SCI was entitled to an "additional sales price" ignored the arbitrator's decision and erroneously gave a windfall to SCI. Moreover, they maintain that SCI was estopped from seeking an "additional sales price" because, in drawing upon the letter of credit, SCI effectively "released" any further claims or causes of action against them.

¶ 23     SCI counters that DMV, JDL and 1035 LLC failed to show clearly and convincingly that

_____

[3]DMV, JDL and 1035 LLC filed joint initial and reply briefs before this court.

the prior arbitration involved the same issues as the case at bar so as to invoke the doctrine of collateral estoppel. SCI maintains that the arbitrator did not make any findings that the parties' three agreements constituted one agreement, nor was there any discussion in the arbitration award that SCI's rescission of the development agreement effectively rescinded all three agreements. Rather, SCI argues, the arbitrator focused exclusively on, and expressly limited his holding to, the development agreement in determining the issues presented before him. Specifically, SCI contends that the arbitrator's award of damages only corresponded to the breach of the development agreement, and that the arbitrator's holding relating to the development agreement had no bearing on the central questions of the case.

¶ 24    Generally, arbitration awards have the same collateral estoppel effect as court judgments. *Peregrine Financial Group, Inc. v. Martinez*, 305 Ill. App. 3d 571, 578-79, 712 N.E.2d 861, 867 (1999). Collateral estoppel is an equitable doctrine that prevents a party from relitigating an issue that had already been decided in a prior proceeding. *Hope Clinic for Women, Inc.*, 2011 IL App (1st) 101463, ¶ 69. "However, 'the judgment in the first suit operates as an estoppel only as to the point or question actually litigated and determined and not to [any] other matters which *might* have been litigated and determined.' " (Emphasis in original.) *Id.* at ¶ 70 (quoting *Nowak v. St. Rita High School*, 197 Ill. 2d 381, 390, 757 N.E.2d 471, 477 (2001), citing *Housing Authority for La Salle County v. Young Men's Christian Ass'n of Ottawa*, 101 Ill. 2d 246, 252, 461 N.E.2d 959, 962 (1984)). Collateral estoppel applies when the minimum threshold of three requirements is met: "(1) the issue decided in the prior adjudication is identical to the one presented in the current suit; (2) a final judgment on the merits was entered in the prior adjudication; and (3) the party against whom estoppel is asserted was a party to or was in privity with a party to the prior adjudication." *Ford Motor Credit Co. v. Cornfield*, 395 Ill. App. 3d 896, 910, 918 N.E.2d 1140, 1153 (2009). "The party asserting the doctrine of collateral estoppel bears the 'heavy burden' of demonstrating with clarity and certainty what the prior judgment determined." *Peregrine Financial Group, Inc.*, 305 Ill. App. 3d at 581, 712 N.E.2d at 868. The application of this doctrine must be "narrowly tailored to fit the precise facts and issues that were clearly determined in the prior judgment," and even if the minimum threshold requirements are met, a court must still consider the equities of applying this doctrine. (Internal quotation marks omitted.) *Hope Clinic for Women, Inc.*, 2011 IL App (1st), ¶¶ 70-71.

¶ 25    We find the doctrine of collateral estoppel to be inapplicable to the case at bar. Based on the record, we find that DMV, JDL and 1035 LLC failed to demonstrate with "clarity and certainty" that the arbitration award had already determined the issue presented before us–specifically, whether SCI was entitled to an additional payment under the terms of the earnest money contract. The arbitration award specified three issues that the arbitrator resolved, all of which pertained to the development agreement. Those issues were whether JDL and DMV's delay in building the new funeral home was a material breach of the development agreement; whether the $3.5 million letter of credit constituted liquidated damages for the breach committed by JDL and DMV; and what actual damages were owed to SCI. The arbitrator expressly found that JDL and DMV materially breached the *development agreement*, that SCI intentionally and voluntarily rescinded the *development agreement* when it drew upon and received the entirety of the $3.5 million letter of credit,

that the letter of credit pursuant to paragraph 1(g) of the *development agreement* did not constitute a valid and enforceable liquidated damage for the breach, and that the letter of credit "was meant to 'assure performance' " of the *development agreement*, and therefore, SCI was owed actual damages in the amount of $1,729,640, plus interest. Based on these express findings of the arbitrator, we cannot conclude that the issue in the case at bar was identical to the ones presented at the arbitration. Thus, we hold that the doctrine of collateral estoppel was inapplicable to bar SCI's first amended counterclaim for an additional payment under the terms of the earnest money contract.

¶ 26    Nonetheless, DMV, JDL and 1035 LLC argue that the arbitration award had a preclusive effect on the instant cause of action because the arbitrator had also expressly found that the three executed agreements "collectively set forth the terms of the transaction pursuant to which the [p]roperty was sold by SCI to JDL." They argue that the quoted language was an express finding by the arbitrator that the three agreements constituted a single agreement and that, as a result, SCI's rescission of the development agreement effectively prevented it from seeking damages under the earnest money contract because SCI had already been made whole for the sale of the entire property. Further, they maintain that the effect of SCI's drawing upon the letter of credit "released" DMV, JDL and 1035 LLC from any further claims or causes of action under any of the three executed agreements.

¶ 27    We find these arguments to be unpersuasive. First, the language relied upon by DMV, JDL and 1035 LLC was set forth in the "general findings" section of the arbitration award, along with background facts and circumstances under which the parties engaged in the business transactions pertaining to the property. In other words, it was a part of the generalized factual perspective underpinning the transaction. We find that the quoted language in the arbitration award order which DMV, JDL and 1035 LLC rely upon to support their argument falls short of meeting the heavy burden of clarity and certainty needed to prevail. There is no determination by the arbitrator that the three agreements are merged into a single agreement. See *Peregrine Financial Group, Inc.*, 305 Ill. App. 3d at 581, 712 N.E.2d at 868 (party asserting collateral estoppel bears the heavy burden of showing with clarity and certainty what the prior judgment determined). Thus, we reject the contention that SCI's rescission of the development agreement necessarily effectuated the rescission of all three agreements. We note this particularly in light of the arbitrator's specific and repeated references throughout the written arbitration award order that SCI had rescinded the *development agreement*. Nowhere in the arbitration award order did the arbitrator find that SCI rescinded the earnest money contract or the lease agreement. Second, as the trial court correctly found, while the parties' agreements constituted the parties' business deal, each was a separate agreement with its own purpose. Although the arbitrator determined actual damages owed to SCI as a result of its rescission of the development agreement, the issue of whether additional payment was due under the earnest money contract was a separate matter. Further, while DMV, JDL and 1035 LLC argue that SCI had already been made whole by the arbitration award and had been returned to its pretransaction position, singularly, this could not and did not alter the fact that the three agreements were separate agreements. Finally, we find that the release provision under paragraph 5 of the development agreement referred only to claims under "this [a]greement"–the development agreement–and thus, the

effect of SCI's drawing upon the letter of credit did not release DMV, JDL and 1035 LLC from further claims and causes of action against them which arose from the earnest money contract. We likewise reject various arguments in DMV, JDL and 1035 LLC's reply brief in support of their argument that the doctrine of collateral estoppel applies to the instant case. A majority of those arguments was premised on the belief that the parties' agreements were inseparable. Therefore, we conclude that the first threshold requirement for the doctrine of collateral estoppel had not been satisfied and we need not address the remaining two requirements. Accordingly, the arbitration award had no preclusive effect on the instant cause of action.

¶ 28    Next, we determine whether SCI could maintain a separate claim for an "additional sales price" under the terms of the earnest money contract.

¶ 29    DMV, JDL and 1035 LLC argue that, even if the doctrine of collateral estoppel was inapplicable, SCI is barred from recovering an "additional sales price" under the terms of the earnest money contract because the trial court should have construed the parties' three agreements as a single agreement, the effect of which would have released all further claims and causes of action against them. They maintain that the three agreements should be construed as a single agreement because they were contemporaneously executed and that, under this single agreement, SCI had released all further claims against them by invoking the letter of credit and receiving full satisfaction of its contractual rights from the arbitration award.

¶ 30    SCI counters that the trial court correctly found that the three agreements were separate and did not constitute a unified agreement. Thus, SCI argues, the earnest money contract survived SCI's rescission of and the release effectuated under the development agreement so that it could maintain a claim for additional payment under the earnest money contract.

¶ 31    The interpretation of a contract presents a question of law, which we review *de novo*. *Gallagher v. Lenart*, 226 Ill. 2d 208, 219, 874 N.E.2d 43, 50 (2007). "The primary objective in construing a contract is to give effect to the intent of the parties." *Id.* at 232, 874 N.E.2d at 58. The plain and ordinary meaning of the language of the contract is the best indication of the parties' intent. *Id.* at 233, 874 N.E.2d at 58. "Moreover, because words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others." *Id.* The parties' intent may not "be gathered from detached portions of a contract or from any clause or provision standing by itself." *Id.* Under Illinois contract interpretation, "instruments executed at the same time, by the same parties, for the *same purpose*, and in the course of the same transaction are regarded as one contract and will be construed together." (Emphasis added.) *Id.* However, such instruments must be construed as separate agreements when there is evidence that the parties intended for the documents to be read separately. *International Supply Co. v. Campbell*, 391 Ill. App. 3d 439, 448, 907 N.E.2d 478, 486 (2009).

¶ 32    In the instant case, the trial court found that "[w]hile all three of the parties' agreements constituted the parties' deal, each was a separate agreement and each had its own purpose." We agree with this conclusion. The opening paragraphs of the development agreement expressly stated that, "[t]hrough various agreements," the parties intended to provide for the

sale of the property to JDL, the temporary relocation of SCI's funeral business to a nearby location, the redevelopment of the property, and the conveyance of a new funeral home on the property to SCI. The development agreement further provided that "[t]o accomplish these *purposes*, simultaneously with the execution of this [a]greement, the parties have executed and delivered" the earnest money contract for the sale of the property and the lease agreement for the temporary relocation of SCI's funeral business. (Emphasis added.) Based on our review of the three agreements in their entirety, we find that although they were executed by the parties in connection with the same business deal, each agreement set forth the specific terms by which its separate and unique purpose would be fulfilled. Thus, we find that the parties intended the three agreements, each with a separate purpose, to be construed as separate agreements. In reaching this conclusion, we are mindful of the language under paragraph 11(a) of the development agreement, which stated that "[t]his [a]greement, *** and the [d]ocuments referred to herein, collectively constitute the entire agreement of the parties with respect to the subject matter hereof and supersede all prior agreements and understandings between the parties relating thereto." DMV, JDL and 1035 LLC cite to this specific clause as evidence that the parties intended for the three agreements to be read as a single agreement. We reject this contention and find that, this clause, as examined in isolation, failed to negate the clear intent of the parties for the three agreements to be construed as separate agreements. See *Gallagher*, 226 Ill. 2d at 233, 874 N.E.2d at 58 (the parties' intent may not "be gathered from detached portions of a contract or from any clause or provision standing by itself"). Likewise, we reject DMV, JDL and 1035 LLC's argument in their reply brief that the "codependency" of the three agreements on one another was evidence that they should be construed as a single agreement, where the examples cited by DMV, JDL and 1035 LLC only served to underscore the connection between the three agreements as constituting the parties' business deal with regard to the property, but did not establish an intent by the parties to construe them as a unified contract.

¶ 33    We further find that the plain language of the agreements established the parties' intent that the release provision under paragraph 5 of the development agreement did not bar recovery for an "additional sales price" under the terms of the separate earnest money contract. The plain language of the development agreement clearly defined the term "agreement" to include only the development agreement, while it used the term "documents" to collectively refer to all three agreements. The release provision under paragraph 5 of the development agreement explicitly barred further claims and causes of action against JDL under "this [a]greement," rather than "the documents." Thus, it is clear and unambiguous that the parties intended the terms of the earnest money contract to survive SCI's rescission of the development agreement and that the triggering of the release provision under the development agreement had no effect on claims arising from the parties' other agreements. Therefore, we find that the trial court properly found that SCI could maintain a separate claim for, and was entitled to, an "additional sales price" under the terms of the earnest money contract.

¶ 34    We next determine whether the trial court erred in entering judgment against 1035 LLC, which we review under a manifest weight of the evidence standard. See *Westlake v. C. House Corp.*, 2011 IL App (1st) 100653, ¶ 21. "A judgment is not against the manifest weight of

-10-

the evidence unless the opposite conclusion is clearly evident." *Id.* A reviewing court accepts the view of the trier of fact as long as it is reasonable and will not overturn a trial court's ruling merely because different conclusions could be drawn from the evidence. *Id.*

¶ 35 DMV, JDL and 1035 LLC argue that the trial court erred in finding 1035 LLC liable to SCI for an "additional sales price" under the terms of the earnest money contract because it was not a party to the agreement nor was it a "successor" to either JDL or DMV, where 1035 LLC was formed in an arm's-length commercial deal and there was no continuity of ownership between DMV and 1035 LLC.

¶ 36 SCI counters that ample evidence was presented at trial to establish that 1035 LLC was properly found liable for an additional payment under the earnest money contract because it had the same ownership and management as DMV, and that 1035 LLC owned and operated the property through the same entities as DMV. Thus, SCI maintains, 1035 LLC was merely a continuation of DMV and the transaction between them amounted to a *de facto* merger, which allowed the trial court to find 1035 LLC liable under the parties' agreements.

¶ 37 Generally, "a corporation that purchases the assets of another corporation is not liable for the debts or liabilities of the transferor corporation." *Vernon v. Schuster*, 179 Ill. 2d 338, 344-45, 688 N.E.2d 1172, 1175 (1997). This rule of "successor corporate nonliability" developed partly in order to protect bonafide purchasers from unassumed liability. *Id.* However, four exceptions to the general rule of successor corporate nonliability exist: "(1) where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligations." *Id.* at 345, 688 N.E.2d at 1175-76.

¶ 38 We find that the third exception to the general rule of successor corporate nonliability applies to these facts, and thus, the trial court properly imposed liability on 1035 LLC, along with DMV and JDL, for an "additional sales price" owed to SCI under the terms of the earnest money contract. The "continuation exception" of the rule of successor corporate nonliability applies "when the purchasing corporation is merely a continuation or reincarnation of the selling corporation." *Id.* at 346, 688 N.E.2d at 1176. "In other words, the purchasing corporation maintains the same or similar management and ownership, but merely 'wears different clothes.' " *Id.* (quoting *Bud Antle, Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451, 1458 (11th Cir. 1985), and citing *Nilsson v. Continental Machine Manufacturing Co.*, 251 Ill. App. 3d 415, 418, 621 N.E.2d 1032, 1034 (1993)). The test used to determine whether one corporate entity is a continuation of another is "whether there is a continuation of the *corporate entity of the seller*–not whether there is a continuation of the *seller's business operation*." (Emphases in original.) *Vernon*, 179 Ill. 2d at 346, 688 N.E.2d at 1176. A common identity of officers, directors, ownership and stocks between the selling and purchasing corporation is a key element of what constitutes a "continuation." *Id.* at 347, 688 N.E.2d at 1176. However, "the continuity of shareholders necessary to a finding of mere continuation does not require complete identity between the shareholders of the former and successor corporations." *Park v. Townson & Alexander, Inc.*, 287 Ill. App. 3d 772, 775, 679 N.E.2d 107, 110 (1997).

¶ 39	It is undisputed that, in December 2000, JDL and DMV entered into an assignment agreement by which JDL assigned its rights and obligations under the development agreement and earnest money contract to DMV. Letchinger, in his capacity as sole owner for both JDL and DMV, was the only signatory to the assignment agreement. It is also undisputed that SCI transferred the property at issue to DMV in December 2000. In May 2004, DMV sold and transferred the property to 1035 LLC. At trial, evidence was presented that Letchinger wholly owned DMV at the time it sold the property to 1035 LLC, that he had approximately 60% ownership of 1035 LLC, and that J&A Holdings Corporation (J&A Holdings)–whose sole shareholder was his wife–had 10% ownership of 1035 LLC. See generally *Steel Co. v. Morgan Marshall Industries, Inc.*, 278 Ill. App. 3d 241, 249, 662 N.E.2d 595, 600 (1996) (finding that a continuity of shareholders existed to impose successor corporate liability, where, though the sole shareholder of the predecessor company was not a shareholder of the successor company, his wife had an ownership interest in the successor company and he acted as chief executive officer (CEO) of the successor company). Letchinger testified that DMV was an entity which was set up as an assignee for the property and that he later established 1035 LLC as a new entity to purchase the property from DMV. He further testified that both DMV and 1035 LLC had a common purpose of developing the property at issue, that he served as president of J&A Holdings in May 2004, and that all the entities shared the same physical office and mailing address. Evidence in the record further shows that Letchinger signed certain documents on behalf of 1035 LLC in his capacity as "manager," and that both 1035 LLC and DMV worked with the same architect, general contractor and banking institutions in developing the property. Based on our review of the record, we find that there was sufficient common identity of ownership and management for both DMV and 1035 LLC to compel the conclusion that 1035 LLC was merely a continuation of DMV at the time the property was sold to 1035 LLC. Thus, we find that the "continuity exception" applies to circumvent the general rule of a successor corporation's nonliability. Therefore, the trial court's conclusion that obligations and liabilities owed to SCI under the earnest money contract should be imposed upon 1035 LLC was not against the manifest weight of the evidence.

¶ 40	We next examine whether the trial court miscalculated the damages pursuant to the terms of the parties' agreements.

¶ 41	DMV, JDL and 1035 LLC argue that the trial court erred in calculating damages owed to SCI under the terms of the earnest money contract. Specifically, they contend that the trial court erroneously calculated the damages, and thus arrived at an artificially inflated amount, by subtracting the FAR-based figure of 77,895 square feet from 112,124.87 square feet, which was a gross *building* area that included parking areas and which was not an FAR-based number. Rather, the trial court should have subtracted 77,895 square feet from 85,030 square feet, which was a gross *buildable* area that excluded parking areas, in order to arrive at a figure that was consistent with the Chicago zoning and land use ordinance (Chicago Municipal Code §§ 17-17-0204, 17-17-0305-B (eff. Aug. 1, 2004)).

¶ 42	SCI counters that the trial court properly used the figure of 112,124.87 square feet in determining damages owed to it under the "additional sales price" provision of the earnest money contract.

¶ 43    In the case at bar, it was stipulated by the parties that paragraph 1 of the earnest money contract was clear and unambiguous. Paragraph 1 of the earnest money contract provided for the sale of the property from SCI to JDL for $4 million, and set forth the terms of an "additional sales price" owed to SCI in an amount "equal to [$51.35] times the number of square feet of gross buildable area in excess of [77,895 square feet] for which [JDL], its successors or assigns, obtain the requisite governmental approvals and which is available to [JDL], its successors and assigns, to build out, or which is in fact built out, at any time prior to December 31, 2010." The record shows that John Ernst (Ernst), a commercial real estate broker, testified at trial that the property at issue had a permissible gross buildable area of 77,895 square feet, which was calculated by multiplying the land area of the property (15,579 square feet) by an FAR of 5.0. The trial court found that 77,895 square feet was a base figure for the "gross buildable area" used in paragraph 1 of the earnest money contract.

¶ 44    As discussed, the parties stipulated that in August 2004, the city of Chicago rezoned the property such that the maximum FAR permitted to be built on the property increased to an FAR of 5.8. At trial, SCI presented the testimony of an architect, David Scott (Architect Scott), and an engineer, Gregory Lehn (Engineer Lehn), which the trial court found to be credible. Both Architect Scott and Engineer Lehn testified that the *maximum* amount of buildable area *permitted* by the city of Chicago, based on an increase in FAR value from 5.0 to 5.8, was 90,358.2 square feet (15,579 square feet of land area of the property x FAR 5.8).[4] They testified that the figure of 90,358.2 square feet was the total amount of floor area, in accordance with the city of Chicago's zoning rules, that was *allowed* to be built by JDL and DMV. Architect Scott testified that the developer may choose to build up to the full amount of the allowable square footage or may choose to build only a portion of the allowable square footage. Engineer Lehn testified that in his opinion, the total gross *building* area for the residential condominium building was 112,124.87 square feet, which included the building's parking garage and loading dock areas. However, Engineer Lehn also testified that, after deducting the square footage for the specified areas such as the parking garage, loading dock, mechanical equipment shaft, storage areas, and a portion of the elevator shaft in order to account for the city of Chicago's zoning rules, the net FAR floor area of the residential condominium building was 85,030 square feet. See Chicago Municipal Code § 17-17-0305-B (eff. Aug. 1, 2004) ("[f]or the purpose of calculating *floor area ratios*, floor area devoted to required loading, *accessory parking* and the drive aisles and circulation area associated with such loading and parking are not to be counted as 'floor area' " (emphasis in original)); Chicago Municipal Code § 17-17-0204 (eff. Aug. 1, 2004) (accessory parking is "[p]arking provided to comply with minimum off-street parking requirements and non-required parking that is provided exclusively to serve occupants of or visitors to a particular use, rather than the public at-large"). Although the ordinance allowed up to 90,358.2 square feet, the developer chose to build a smaller amount of space, 85,030 square feet, which was within the ordinance guidelines. The allowable space could be less but could not exceed 90,358.2 square feet as allowed by the ordinance. The record reveals no contrary expert testimony to Engineer Lehn's testimony regarding the buildable residential condominium space of 85,030

_____

[4]Engineer Lehn rounded this figure up to the nearest whole number of 90,358 square feet.

square feet for purposes of the zoning ordinance.

¶ 45   The trial court then found that there was no issue as to the meaning of "gross buildable area" and used the figure of 112,124.87 square feet to calculate the damages owed to SCI pursuant to paragraph 1 of the earnest money contract. The trial court then found that SCI was entitled to damages in the amount of $1,757,703 ((112,124.87 square feet - 77,895 square feet) x $51.35), plus costs. Based on our review of the record, we find that the trial court erred in using the gross *building* area of 112,124.87 square feet to calculate the number of square feet in excess of the 77,895 square feet of space that was built as the residential condominium building. The 112,124.87 square feet figure was one which did not exclude the specified areas set forth by the Chicago zoning ordinance. In fact, the plan of development statement for the property at issue expressly stated that, in addition to the exclusions expressed by the Chicago zoning ordinance for the purposes of FAR calculations, the floor areas shall not include "all floor area [*sic*] devoted to mechanical equipment and storage areas which exceeds 5000 square feet, and \*\*\* all floor area [*sic*] associated with parking and loading areas." In reaching this conclusion, we find particularly persuasive DMV, JDL and 1035 LLC's argument that the 112,124.87 square feet was the wrong value from which to calculate SCI's damages because it exceeded the *maximum* amount of buildable area (90,358.2 square feet) *permitted* by the city of Chicago. Thus, the FAR-based number of 77,895 square feet should be subtracted from the FAR-based figure of 85,030 square feet, which was the gross *buildable* area, rather than from a figure (112,124.87 square feet) which was calculated without regard to the Chicago zoning ordinance's specified areas of exclusion and the property's plan of development statement. As discussed, the 85,030 square feet figure was the gross buildable area of the residential condominium building after deducting specified areas excluded by Chicago's zoning rules. Therefore, the trial court's calculation of damages was against the manifest weight of the evidence. See generally *Doornbos Heating & Air Conditioning, Inc. v. Schlenker*, 403 Ill. App. 3d 468, 487, 932 N.E.2d 1073, 1091 (2010).

¶ 46   For the foregoing reasons, we affirm the portion of the trial court's holding that DMV, JDL and 1035 LLC were liable to SCI for an "additional sales price" pursuant to paragraph 1 of the earnest money contract, and vacate only the trial court's calculation of damages and remand the cause to the trial court solely for the recalculation of damages, including costs, which is consistent with this court's order. Specifically, the trial court is directed to calculate the damages based on the figure arrived at by subtracting the FAR-based number of 77,895 square feet from the FAR-based number of 85,030 square feet, which was the buildable residential space under the zoning ordinance.

¶ 47   Affirmed in part and vacated in part; cause remanded with directions.

-14-