# Illinois Official Reports

## Appellate Court

---

***Guterman Partners Energy, LLC v. Bridgeview Bank Group*, 2018 IL App (1st) 172196**

---

| | |
|---|---|
| Appellate Court Caption | GUTERMAN PARTNERS ENERGY, LLC, Plaintiff-Appellant, v. BRIDGEVIEW BANK GROUP, Defendant-Appellee. |
| District & No. | First District, Fourth Division<br>Docket No. 1-17-2196 |
| Filed | March 29, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-L-11747; the Hon. Diane M. Shelley, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Charles Aaron Silverman, of Skokie, for appellant.<br><br>Steven R. Radtke, of Chill, Chill & Radtke, P.C., of Chicago, for appellee. |
| Panel | JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justices McBride and Ellis concurred in the judgment and opinion. |

**OPINION**

¶ 1    The instant appeal arises from an uncompleted purchase between plaintiff Guterman Partners Energy, LLC, and defendant Bridgeview Bank Group, in which plaintiff sought to purchase certain loan documents from defendant. During the time in which the parties intended to close on the purchase, plaintiff paid $400,000 to defendant as a deposit. The closing never occurred, and defendant retained the deposit. Plaintiff filed suit for the return of the deposit, claiming that the closing never occurred because plaintiff had discovered that defendant did not actually "own" the loan documents it was attempting to sell. Both parties filed motions for summary judgment, and the trial court denied plaintiff's motion for summary judgment and granted defendant's motion for summary judgment. Plaintiff appeals and, for the reasons that follow, we affirm.

¶ 2                                                    BACKGROUND
¶ 3                                                    I. Complaint
¶ 4    On November 17, 2015, plaintiff filed a complaint against defendant; the complaint was amended on June 14, 2016. It is the amended complaint that is at issue on appeal. In the complaint, plaintiff sought to recover $400,000 in deposits that it had made in connection with its agreement to purchase certain loan documents from defendant. Defendant allegedly appropriated the funds from plaintiff's account at defendant bank, claiming that plaintiff had forfeited the funds because plaintiff had failed to close on the purchase of the loan documents. The complaint alleged that this action was wrongful because (1) plaintiff had no obligation to close on the purchase and therefore did not forfeit its deposits because defendant did not own the loan documents that it was purporting to sell (a breach of contract count) and (2) defendant had no right or authority to reach into plaintiff's account and remove the funds (a conversion count).[1]

¶ 5    The agreement at issue was dated June 17, 2015, and was entitled the "Non-Recourse Loan Sale Agreement" (LSA). Under the LSA, which is described in further detail below, plaintiff was to purchase defendant's position as secured lender with respect to two loan transactions.

¶ 6    The first transaction concerned a 2009 loan made by plaintiff to 401 Properties Limited Partnership (401 Partnership). The 401 Partnership loan was secured by an office building located at 401 South LaSalle Street in Chicago, and defendant held a mortgage on this property as security for the loan.

¶ 7    The second transaction was a 2010 loan made by defendant to 401 LaSalle Lenders LLC (LaSalle Lenders), which was done in order to facilitate LaSalle Lenders's purchase of defendant's interest in the 401 Partnership loan. According to the complaint, "[p]ursuant to the LaSalle Lenders Loan, [defendant] assigned to LaSalle Lenders all of its right, title, and interest in the 401 Partnership Loan, including the underlying promissory notes."

¶ 8    According to the complaint, in 2013, defendant "took the position" that LaSalle Lenders was in default on the LaSalle Lenders loan and, "[i]n connection with the resolution of that

---

[1]The conversion cause of action is not at issue on appeal, and accordingly, we do not delve into detail on this issue.

purported default, [defendant] contends that LaSalle Lenders re-assigned its interest in the 401 Partnership Loan back to [defendant]."

¶ 9    The complaint alleges that, pursuant to the LSA, plaintiff sought to purchase from defendant both the 401 Partnership loan and the LaSalle Lenders loan for a total purchase price of $10.1 million, for which plaintiff "would acquire loans with outstanding balances exceeding $15 million (for the 401 Partnership Loan) and $9 million (for the LaSalle Lenders Loan)." Additionally, "[plaintiff] would also acquire security interests in the underlying collateral—including a senior mortgage on the commercial office building at 401 South LaSalle Street."

¶ 10    The complaint further alleges:

"12. In light of the foregoing, [plaintiff] bargained for [defendant's] representation and warranty that it actually *owned* and had the authority to sell the documents that it was purporting to sell to [plaintiff] including, significantly, the promissory notes that evidenced the 401 Partnership Loan.

13. Accordingly, as a condition precedent to [plaintiff's] obligation to close the transaction and purchase these positions, the LSA required [defendant] to make several representations and warranties. Key among them, [defendant] was required to represent and warrant that it owned the documents comprising both loans, and accordingly, had the power and authority to sell both loan positions to [plaintiff].

14. *** [Defendant] was unable, and remains unable, to honor this representation and warranty." (Emphasis in original.)

¶ 11    According to the complaint, upon LaSalle Lenders's default under the LaSalle Lenders loan in 2013, defendant "did not take the steps required to enforce any alleged security interest [defendant] had in the collateral for that loan," namely, the 401 Partnership loan promissory notes "that [defendant] had sold to LaSalle Lenders in 2010 and no longer owned." Due to defendant's failure, "multiple parties involved in bankruptcy proceedings related to 401 Partnership (initiated in December 2014) have since challenged whether [defendant] owns the loan documents that [defendant] agreed to sell to [plaintiff] in 2015 pursuant to the LSA." The complaint alleges that even LaSalle Lenders claimed in the bankruptcy proceeding that it never assigned the promissory notes back to defendant.

¶ 12    The complaint alleges that plaintiff "raised these issues" with defendant prior to the LSA's closing date and "suggested steps that might be taken to put [defendant] in a position to represent and warrant its ownership of all the loan documents." However, defendant did not take any of these steps "and by the time of that scheduled closing date, it was clear that [defendant] could not represent and warrant that it owned the notes and had the authority to sell them to [plaintiff]." The complaint also alleges that in the months leading up to the closing date, defendant failed to provide plaintiff a complete and accurate set of documents underlying the two loans during the LSA's "due diligence" period.[2] Consequently, "[a]s a result of this course of conduct, defendant was unable to fulfill the conditions precedent to [plaintiff's] obligation to close pursuant to the LSA."

¶ 13    According to the complaint, despite defendant's failure to honor its obligations, defendant unilaterally appropriated the $400,000 that plaintiff had deposited in plaintiff's savings

---

[2]This allegation is not at issue on appeal.

account at defendant bank.

II. LSA

¶ 15    Attached to the complaint was a copy of the LSA, which was dated June 17, 2015. Since the precise language of the LSA is at issue on appeal, we quote from the relevant provisions extensively. The LSA's recitals provided, in relevant part:

> "WHEREAS, Purchaser has expressed to Seller its intent to purchase certain loan documents possessed by Seller and represented by certain mortgages, loan documents and other documents described more fully in *Exhibit A* to this Agreement (the 'Loan Documents'),
>
> WHEREAS, Seller desires to sell, and Purchaser desires to purchase, all of Seller's right, title and interest in, and to the Loan Documents on the terms and conditions as set forth below[.]"

¶ 16    Article II was entitled "Purchase and Sale of the Loan Documents." Section 2.1 provided:

> "Section 2.1 Purchase and Sale; Release of Servicing Rights. Subject to the terms and provisions set forth in this Agreement, on the Closing Date,[3] Purchaser shall purchase all of Seller's right, title and interest in the Loan Documents from Seller and Seller shall sell, transfer, assign and convey such Loan Documents to Purchaser. The Loan Documents shall be sold to Purchaser with all servicing rights being assigned to Purchaser."

¶ 17    Section 2.2 concerned one of the deposits at issue on appeal:

> "2.2 Deposit against Purchase Price. Purchaser shall contemporaneously with the execution of this Agreement deposit $100,000.00 ('Refundable Deposit') with Seller. Purchaser may terminate this Agreement for any reason or no reason whatsoever in Purchaser's sole discretion, by delivering written notice of such termination to Seller before the expiration of the Due Diligence Period (as defined below). In the event that the Purchaser terminates this Agreement prior to the expiration period of the Due Diligence Period, Seller shall return the Refundable Deposit within three (3) business days of written notification. Should Purchaser elect to proceed to closing or otherwise fail to deliver written notice to Seller of its intent to terminate this Agreement, Seller may retain the Refundable Deposit as liquidated damages as its sole remedy. The Refundable Deposit shall become non-refundable after the expiration of the Due Diligence Period (as defined below). If Purchaser requests an extension of the Due Diligence Period, Seller may grant it at its sole discretion. Upon closing, the Refundable Deposit shall be credited to the Purchase Price."

The "Purchase Price" was set at $10.1 million. The "Due Diligence Period" terminated on June 30, 2015; under section 6.1(a) of the LSA, during this period, "Purchaser is entitled to inspect and review Seller's information in its possession and control as it relates to: (i) legal documents, *e.g.*, notes, amendments, deeds, mortgages and title; (ii) loan payment histories; and (iii) payoff schedules."

---

[3]The LSA provided that the closing date was July 31, 2015, "or such other date and time as may be mutually acceptable to both Seller and Purchaser."

¶ 18        Article III of the LSA was entitled "Conditions to Execution and Closing." Section 3.2 concerned conditions precedent to plaintiff's obligations as the purchaser and provided:

> "Section 3.2: Conditions Precedent to Obligations of Purchaser. The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to fulfillment of each of the following conditions (any or all of which may be waived by Purchaser in writing in whole or in part to the extent permitted by applicable Law):
>
> (a) All representations and warranties of Seller set forth in this Agreement shall be true and correct on the Closing Date, except to the extent that such representations and warranties relate to an earlier date or specifically reference another date (in which case such representations and warranties shall be true on and as of such date);
>
> (b) Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date;
>
> (c) There shall not be in effect on the Closing Date any order or decision by a Governmental Authority of competent jurisdiction restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated hereby."

¶ 19        Article IV concerned the closing and provided that defendant "agrees to execute, deliver and/or provide to Purchaser the following at the Closing": (1) "The original Mortgage Notes endorsed, 'Pay to the order of Purchaser or its nominee['] and signed in the name of Seller by an authorized signatory, in the form of *Exhibit E* attached hereto"; (2) "The original Mortgages with all intervening original assignments thereof, with evidence of recording thereon"; (3) "Original Assignment of Mortgage for each Mortgage and each Assignment of Rents assigning each Mortgage and each Assignment of Rents to Purchaser executed by Seller and in form mutually acceptable to Purchaser and Seller"; (4) "An Assignment and Assumption of Loan Documents, assigning the Loan Documents from Seller to Purchaser executed by Seller and in form mutually acceptable to Purchaser and Seller"; (5) "An original of each other Loan Documents"; (6) "To the extent they exist and are in the possession and/or control of Seller, Seller shall Assign each Loan Policy on each Mortgage to Purchaser"; and (7) "To the extent permitted by law, and under the direction of the 401 Properties, an Assignment of all Escrow Accounts to Purchaser."

¶ 20        Article V was entitled "Representations and Warranties of Seller." Section 5.1 provided:

> "Section 5.1 Representations and Warranties by Seller. Each of the following representations and warranties by Seller is true and correct as of the date hereof and shall be true and correct on the Closing Date:
>
> (a) Authority; Binding on Seller; Enforceability. Seller is an Illinois banking company duly formed and validly existing and in good standing under the laws of the State of Illinois. Seller has taken all necessary action to authorize its execution, delivery and performance of this Agreement and has the power and authority to execute, deliver and perform this Agreement and all related documents and all the transactions contemplated hereby, including, but not limited to, the authority to sell the Loan Documents and, assuming due authorization, execution and delivery by each other party hereto, this Agreement and all the obligations of Seller hereunder are the legal, valid and binding obligations of Seller enforceable in accordance with the terms of this Agreement."

Section 5.2 provided, in bold, all-caps letters:

"Section 5.2 Loans Sold 'As Is.' Except as otherwise stated in this Agreement or the other Closing Documents delivered by Seller to Purchaser at Closing the Loan Documents are sold 'as is' and 'with all faults,' without any representation, warranty or recourse whatsoever as to either collectability, condition, fitness for any particular purpose, merchantability or any other warranty, express or implied. Seller specifically disclaims any warranty, guaranty or representation, oral or written, past or present, express or implied, concerning the Loan Documents except as provided above, the stratification or packaging of the Loan Documents, the Collateral Property or the Loan Files."

¶ 21    Article VI was entitled "Conditions Precedent to Closing," and section 6.1 specifically concerned conditions for the benefit of plaintiff as the purchaser:

"The respective obligations of Purchaser and Seller to complete the purchase and sale of the Loan Documents pursuant to this Agreement is subject to the fulfillment on or prior to Closing Date of each of the following additional conditions to be fulfilled by the other, unless the same is specifically waived in writing by the party for whose benefit the same is to be fulfilled:

Section 6.1 Conditions for the Benefit of Purchaser.

(a) Due Diligence. Purchaser is entitled to inspect and review Seller's information in its possession and control as it relates to: (i) legal documents, *e.g.*, notes, amendments, deeds, mortgages and title; (ii) loan payment histories; and (iii) payoff schedules. Purchaser's Due Diligence Period shall terminate on June 30, 2015 ('Due Diligence Period').

(b) Performance of Covenants. Seller shall have performed, if any, all of its covenants and agreements contained herein which are required to be performed by it on or prior to the Closing Date.

(c) Representations and Warranties. All representations and warranties of Seller, if any, contained in this Agreement shall be true in all material respects at and as if made on the Closing Date."

¶ 22    Finally, article VII was entitled "Default" and provided, in relevant part:

"Section 7.1 Purchaser's Default. In the event Purchaser shall default in its obligations to purchase the Loan Documents, Seller shall have the option to waive the default and pursue the following: *** (iv) declare Purchaser in default and retain the Refundable Deposit and terminate this agreement by delivery of written notice of termination.

Section 7.2 Seller's Default. In the event Seller shall default in its obligations to sell the Loan Documents, materially breach any covenant hereunder or otherwise fail to perform any material obligation under this Agreement, Purchaser shall have the option to (i) grant an extension of time for Seller to perform its obligations hereunder (if after said extension the default has not been cured, then Purchaser may elect any of the remaining remedies); provided, however, the *per diem* interest shall not be applicable as provided in 6.1 above, (ii) expressly waive any default of which Purchaser has actual knowledge and proceed to closing; provided, however, the *per diem* interest shall not be applicable as provided in 6.1 above; further provided, any such waiver does not

constitute a waiver of any of Purchaser's other rights or remedies under this agreement; or (iii) terminate this agreement by delivery of written notice of termination to Seller."

¶ 23    Also attached to the complaint was a "Supplemental Agreement" to the LSA, which was executed on July 29, 2015, and extended the closing date to "August 14, 2015, or such other date and time as may be mutually acceptable to both Seller and Purchaser." The supplemental agreement also added a section 2.2(a) to the LSA, which provided:

"Section 2.2(a) Second Deposit against Purchase Price. Contemporaneously with the execution of this Supplemental Agreement, the Purchaser shall deliver to Seller an additional non-refundable cash deposit in the amount of $300,000 ('Non-Refundable Cash Deposit'). The Non-Refundable Cash Deposit shall be sent via wire transfer from Purchaser to Seller in accordance with the wiring instructions set forth in paragraph 2.4 of LSA as defined above. Purchaser understands that in consideration, in part, for Seller negotiating, drafting and agreeing to extend the Closing Date that Purchaser's $300,000 Non-Refundable Cash Deposit will be forfeited to the Seller, in the event that as a result of Purchaser's Default, the sale does not close on the Closing Date (as defined above) in accordance with Section 4 of the LSA. Both the Refundable Deposit and the Non-Refundable Cash Deposit shall serve as a credit against the Purchase Price at Closing."

The supplemental agreement also provided:

"Finally, to clarify, it is agreed that Seller shall assign to Purchaser, Seller's interest in the Bankruptcy matter: *In re: 401 Properties Limited Partnership*, Case No. 14-44983."

## III. Other Exhibits to Complaint

¶ 24

¶ 25    Also attached to the complaint were adversary complaints filed by creditors in connection with a chapter 11 bankruptcy case filed by 401 Partnership, in which the creditors objected to defendant's claim that it was the owner and holder of the note and mortgage for the 401 Partnership loan and claimed that defendant and LaSalle Lenders had "asserted contradictory positions regarding the current ownership" of the note.

## IV. Answer and Affirmative Defenses

¶ 26

¶ 27    On July 8, 2016, defendant filed its answer and affirmative defenses, in which it alleged that, on March 10, 2009, defendant made the 401 Partnership loan, which was secured by a mortgage and evidenced by two promissory notes, made payable to the order of defendant. The 401 Partnership loan transaction closed on March 25, 2009, and defendant "continued to hold physical possession of the 401 Partnership Promissory Notes until October 30, 2015." Defendant alleged that in September 2010, 401 Partnership defaulted on the loan by failing to perform its payment obligations, defendant sold the 401 Partnership loan to LaSalle Lenders, and defendant made the LaSalle Lenders loan to provide the financing for LaSalle Lenders to purchase the 401 Partnership loan. The LaSalle Lenders loan was evidenced by two promissory notes and a collateral assignment of mortgage, dated September 16, 2010. Defendant alleged that "[s]ince [defendant] financed the LaSalle Lenders Loan, [defendant] continued to hold physical possession of the original 401 Partnership Promissory Notes as collateral for the LaSalle Lenders Loan. [Defendant] never transferred physical possession of

the original Promissory Notes to LaSalle Lenders. [Defendant] held physical possession of the 401 Partnership Promissory Notes until October 30, 2015."

¶ 28    Defendant alleged that LaSalle Lenders defaulted on its payment obligations under the LaSalle Lenders loan, and, following the default, executed an "Agreement and Assignment of Mortgage" dated November 1, 2013, "pursuant to which LaSalle Lenders assigned to [defendant] the mortgage securing the loans to 401 [Partnership]." According to defendant, "[a]s a consequence of LaSalle Lender's [*sic*] default, [defendant] became entitled to endorse the Promissory Notes in LaSalle Lender's [*sic*] name in furtherance of its collateral interest in such notes."

¶ 29    With respect to the LSA and its supplemental agreement, defendant alleged that from the date of the supplemental agreement until the August 14, 2015, closing date, defendant advised plaintiff that it was prepared to close. On August 8, 2015, defendant's counsel sent an e-mail to plaintiff's counsel "attaching drafts of the assignments, stating that [defendant] was prepared to execute the Allonge required by the LSA, and confirming the August 14, 2015 Closing Date." Defendant's counsel called plaintiff's counsel on August 10 and 11 to schedule a time for the closing, but plaintiff did not agree to a time for closing on August 14; plaintiff did not appear for a closing on that date, and no closing occurred on that date. At defendant's direction, defendant's counsel prepared and sent a letter to plaintiff's counsel, proposing to extend the closing to August 24, 2015, on certain terms, but plaintiff did not sign the extension letter. Instead, plaintiff's principal, Igor Gabal, sent an e-mail to Jane Shifrin, one of defendant's officers, asking that defendant "hangout" with plaintiff "for a little more time so we can get this done." On August 21, 2015, Gabal sent Shifrin an e-mail, thanking her for defendant's "continued support and cooperation while I am doing my best to consummate this transaction." Plaintiff did not agree to schedule a closing and did not appear for any closing on August 24, 2015. On August 24, 2015, defendant's counsel prepared and sent a letter to plaintiff, declaring a default under the LSA. On August 28, 2015, a different attorney for plaintiff sent a letter to defendant, "claiming for the first time that the closing did not occur because [defendant] was not able to transfer ownership."

¶ 30    Defendant alleged that on October 30, 2015, it sold its right, title, and interest in the loan documents that were the subject of the LSA to a different party. "[Defendant] delivered the original 401 Partnership Promissory Notes and the LaSalle Lenders Promissory Notes to [the purchaser], along with the other Loan Documents. Shortly thereafter, [defendant] assigned the Proof of Claim that it had filed in the 401 Partnership bankruptcy case to [the purchaser]." On January 19, 2016, the bankruptcy court entered an order dismissing one of the adversary complaints as to defendant with prejudice, and on February 19, 2016, the other adversary complaint was amended to substitute the purchaser as a party instead of defendant and defendant "is no longer active in the adversary proceeding."

¶ 31    Defendant raised three affirmative defenses. First, it alleged that plaintiff failed to give notice of termination during the due diligence period, forfeiting the $100,000 deposit. Second, defendant alleged that the sale of the loan documents was governed by article 3 of the Uniform Commercial Code (Code) (810 ILCS 5/3-101 *et seq.* (West 2014)), which did not require a determination as to the "owner" of the note. Instead, the relevant question was whether defendant was "entitled to enforce the note," which defendant claimed it was, alleging that it "was at all times ready, willing and able to deliver possession of the 401 Partnership Promissory Notes and the LaSalle Lenders Promissory Notes" to plaintiff. Third, defendant

- 8 -

alleged that plaintiff breached the LSA by failing to close on the closing date or at any time thereafter, forfeiting the $300,000 nonrefundable cash deposit.

¶ 32 Attached to the answer and affirmative defenses were exhibits supporting defendant's allegations, including (1) copies of the notes in connection with the 401 Partnership loan and the LaSalle Lenders loan, (2) other loan documents, including the collateral assignment of mortgage executed by LaSalle Lenders at the time of the LaSalle Lenders loan and the agreement and assignment of mortgage executed by LaSalle Lenders after its default, and (3) correspondence between plaintiff's and defendant's representatives, culminating in an August 24, 2015, letter from defendant, declaring plaintiff in default and electing to retain the $100,000 refundable deposit and the $300,000 nonrefundable cash deposit and an August 28, 2015, response from plaintiff claiming that "Purchaser did not default on the LSA when it declined to close on the purchase of the Loan Documents that are the subject of the LSA. Purchaser's obligation to close was contingent upon [defendant's] satisfaction of certain conditions precedent—conditions which [defendant] did not and could not satisfy."

¶ 33 As relevant to the instant appeal, the "Collateral Assignment of Mortgage and Other Loan Documents and Security Agreement" was dated September 16, 2010, and was between LaSalle Lenders as the assignor and defendant as the assignee. Section 5 of the collateral assignment of mortgage concerned remedies upon default and provided:

> "5. *Remedies*. Whenever a Default shall exist hereunder, Assignee may, at Assignee's option and without further demand or notice, declare all or any part of the Loan to be immediately due and payable and exercise any of the rights and remedies granted hereunder, under the Notes or under any other of the Loan Documents. *** Assignee may sell, lease or otherwise dispose of the Collateral, or exercise any of the rights conferred upon Assignee by this Agreement or the Notes. *** Assignee is hereby granted the authority, at Assignee's discretion, to: in the name of Assignor or otherwise, in respect of any or all of the Collateral, demand, collect, receive and receipt for, compound, compromise, settle and give acquittances, and take any action which Assignee may deem necessary or desirable in order to realize on the Collateral, including endorsement in the name of Assignor of any checks, drafts, notes or other instruments or documents received in payment of or on account of the Collateral."

¶ 34 The "Agreement and Assignment of Mortgage" was dated November 1, 2013, and was between LaSalle Lenders as the assignor and defendant as the assignee. The assignment of mortgage acknowledged that LaSalle Lenders was in default under the LaSalle Lenders loan and assigned to defendant all of LaSalle Lenders's right, title, and interest in (1) the March 10, 2009, 401 Partnership loan mortgage, assignment of leases and rents, and security agreement; and (2) a March 17, 2009, "Modification of Mortgage and Other Security Documents" in connection with the 401 Partnership loan. The assignment of mortgage made no reference to an assignment of the 401 Partnership loan promissory notes back to defendant.

¶ 35 V. Plaintiff's Motion for Summary Judgment

¶ 36 On February 15, 2017, plaintiff filed a motion for summary judgment on the breach of contract count of its amended complaint, as well as on defendant's affirmative defenses. Plaintiff argued that it had no obligation to close on the purchase of the loan documents—and accordingly did not forfeit its $400,000 in deposits—because defendant "had failed to honor

(and could not honor) its fundamental obligation to warranty that it had the power and authority to sell the loan documents that it was purporting to sell."

¶ 37    Attached to plaintiff's motion for summary judgment was the transcript of the discovery deposition of Jane Shifrin, defendant's vice president of commercial lending at the time of the LSA's execution, who testified as to her understanding of the LSA's terms and its negotiations.

¶ 38                           VI. Defendant's Motion for Summary Judgment

¶ 39    Also on February 15, 2017, defendant filed a motion for summary judgment, arguing that it was entitled to summary judgment because defendant had the authority to sell the notes under the Code and, regardless, plaintiff had agreed to purchase the documents "as is" without any warranties or representations of any kind.

¶ 40    Attached to the motion for summary judgment were excerpts from the discovery deposition of Igor Gabal, plaintiff's principal, in which Gabal testified that plaintiff requested to view "every document" that defendant had as collateral on May 13, 2015; in the same e-mail chain in which plaintiff requested the documents, Gabal indicated that "we are working under [the] assumption that we will buy Bank position" and also sent "our offer to buy [defendant's] interest in 401 S. Lasalle." Gabal also testified that he sent an e-mail on May 27, 2015, in response to Shifrin's rejection of the offer as being too low, in which he stated that "[t]here is a lot of risk we will be taking on by stepping into [defendant's] position." Gabal testified that at the time he made the offer, he was aware that 401 Partnership was in bankruptcy proceedings and was aware that there were subordinated lenders involved.

¶ 41    Also attached to the motion for summary judgment were excerpts from the discovery deposition of John Malarkey, the attorney who represented plaintiff with respect to the LSA. Malarkey testified that he and Gabal met with Shifrin on July 22, 2015, when they inspected defendant's original documents; he had not visited defendant to inspect the documents before that date, which was after the expiration of the due diligence period because he "was overwhelmed with the documents that they gave me during the due diligence period and needed more time."

¶ 42    Additionally, attached to the motion for summary judgment were excerpts from the discovery deposition of Josh Reitman, Shifrin's manager at the time of the LSA, who testified that there had been a demand letter sent to LaSalle Lenders after its default. The letter provided, in relevant part:

>   "Lender hereby provides Borrower with ten (10) days written notice of its intention to retain all of the right, title and interest in the Collateral, including, but not limited to the Properties Notes and exclude therefrom Borrower and any others claiming through or under the Borrower.
>
>   Lender hereby further provides notice of its right to sell, lease or otherwise dispose of the Collateral, or to take any further action that Lender may deem necessary or desirable in order to realize on the Collateral."

¶ 43    Finally, attached to the motion for summary judgment were excerpts from the discovery deposition of Adam Rome, the attorney who represented defendant with respect to the LSA, who testified that plaintiff had sought to extend the closing time because there were "having issues with financing."

¶ 44    The motion for summary judgment also included, *inter alia*, a copy of a *lis pendens* that had been recorded on June 10, 2014, which provided notice that the 401 Partnership mortgage was being foreclosed and the names of the subordinate lenders.

¶ 45                                      VII. Trial Court Order

¶ 46    On April 10, 2017, the trial court entered an order denying plaintiff's motion for summary judgment and granting defendant's motion for summary judgment. The trial court did not set forth the basis for its ruling, and there is no transcript of the hearing on the parties' cross-motions for summary judgment. Defendant subsequently filed a petition for attorney fees, which was granted by the trial court on August 8, 2017, and a judgment for $91,067.22 was entered in favor of defendant and against plaintiff; plaintiff does not appeal the attorney fees award. On September 5, 2017, plaintiff filed a notice of appeal, and this appeal follows.

¶ 47                                          ANALYSIS

¶ 48    On appeal, plaintiff argues that the trial court erred in granting summary judgment in defendant's favor, claiming that it did not forfeit its deposits because defendant failed to perform its conditions precedent to closing under the LSA. A trial court is permitted to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2014). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). We review a trial court's decision to grant a motion for summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 49    "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp.*, 154 Ill. 2d at 102. However, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). The party moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The movant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Nedzvekas*, 374 Ill. App. 3d at 624 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). When parties file cross-motions for summary judgment, as was the case here, "they agree that only a question of law is involved and invite the court to decide the issues based on the record." *Pielet v. Pielet*, 2012 IL 112064, ¶ 28 (citing *Allen v. Meyer*, 14 Ill. 2d 284 (1958)); *Ruby v. Ruby*, 2012 IL App (1st) 103210, ¶ 13. However, the filing of cross-motions does not necessarily mean there is not an issue of material fact, nor does it obligate a court to render summary judgment. *Pielet*, 2012 IL 112064, ¶ 28. " 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 50    In the case at bar, the resolution of the parties' dispute turns on the questions of (1) what defendant promised to do under the LSA and (2) whether it satisfied its obligation. Plaintiff claims that defendant promised to sell the 401 Partnership notes and was unable to satisfy that obligation because it did not "own" the notes. Defendant, on the other hand, claims that it was only required to show that it had the authority to sell the notes, which it did. Alternatively, defendant also claims that plaintiff promised to purchase the loan documents "as is," meaning that defendant made no warranties as to the extent of its ownership interest. Our analysis must begin with a discussion of the terms of the LSA.

¶ 51    The principal objective in construing a contract is to determine and give effect to the intention of the parties at the time they entered into the contract. *Fleet Business Credit, LLC v. Enterasys Networks, Inc.*, 352 Ill. App. 3d 456, 469 (2004). " '[A]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence.' " *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999) (quoting *Western Illinois Oil Co. v. Thompson*, 26 Ill. 2d 287, 291 (1962)). A court interpreting a contract begins by examining the language of the contract alone, and "[i]f the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence." *Air Safety*, 185 Ill. 2d at 462 (citing *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill. 2d 440, 447 (1991)). If an ambiguity is present, then the court may admit parol evidence to aid in resolving the ambiguity. *Air Safety*, 185 Ill. 2d at 462-63 (citing *Whitlock*, 144 Ill. 2d at 447). "In interpreting a contract, it is presumed that all provisions were intended for a purpose, and conflicting provisions will be reconciled if possible so as to give effect to all of the contract's provisions." *Shorr Paper Products, Inc. v. Aurora Elevator, Inc.*, 198 Ill. App. 3d 9, 13 (1990).

> "A court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used. [Citation.] Further, when parties agree to and insert language into a contract, it is presumed that it was done purposefully, so that the language employed is to be given effect. [Citation.]" *Thompson v. Gordon*, 241 Ill. 2d 428, 442 (2011).

¶ 52    In the case at bar, the first question we must determine is what, exactly, defendant agreed to sell and plaintiff agreed to buy under the terms of the LSA. In its recitals, the LSA provides that "Purchaser has expressed to Seller its intent to purchase certain loan documents possessed by Seller" and further provides that "Seller desires to sell, and Purchaser desires to purchase, all of Seller's right, title and interest in, and to the Loan Documents on the terms and conditions as set forth below[.]" The agreement to purchase itself is contained in section 2.1 and provides:

> "Section 2.1 Purchase and Sale; Release of Servicing Rights. Subject to the terms and provisions set forth in this Agreement, on the Closing Date, Purchaser shall purchase all of Seller's right, title and interest in the Loan Documents from Seller and Seller shall sell, transfer, assign and convey such Loan Documents to Purchaser. The Loan Documents shall be sold to Purchaser with all servicing rights being assigned to Purchaser."

¶ 53    Section 4.2 of the LSA sets forth the documents that defendant was required to "execute, deliver and/or provide to Purchaser" at the closing: (1) "The original Mortgage Notes endorsed, 'Pay to the order of Purchaser or its nominee['] and signed in the name of Seller by an authorized signatory, in the form of *Exhibit E* attached hereto"; (2) "The original Mortgages

with all intervening original assignments thereof, with evidence of recording thereon"; (3) "Original Assignment of Mortgage for each Mortgage and each Assignment of Rents assigning each Mortgage and each Assignment of Rents to Purchaser executed by Seller and in form mutually acceptable to Purchaser and Seller"; (4) "An Assignment and Assumption of Loan Documents, assigning the Loan Documents from Seller to Purchaser executed by Seller and in form mutually acceptable to Purchaser and Seller"; (5) "An original of each other Loan Documents"; (6) "To the extent they exist and are in the possession and/or control of Seller, *** each Loan Policy on each Mortgage to Purchaser"; and (7) "To the extent permitted by law, and under the direction of the 401 Properties, an Assignment of all Escrow Accounts to Purchaser." Section 5.1 further required that defendant warrant that

> "Seller has taken all necessary action to authorize its execution, delivery and performance of this Agreement and has the power and authority to execute, deliver and perform this Agreement and all related documents and all the transactions contemplated hereby, including, but not limited to, the authority to sell the Loan Documents ***."

¶ 54 Reading the express language of the LSA, it is apparent that the parties contracted for plaintiff to purchase "all of Seller's right, title and interest in the Loan Documents from Seller," and defendant was required to provide a number of documents at closing and to warrant that it had the authority to sell the loan documents, including the promissory notes at issue. We see nowhere in the language of the LSA where defendant warrants that it "owns" the notes; in fact, the LSA does not contain the terms "own," "owner," or "ownership" anywhere within its provisions. To the extent that plaintiff uses the term "ownership" to mean "holding absolute title to" the notes, there is also no language in the LSA suggesting that defendant was required to convey absolute title to the notes. Accordingly, the language of the LSA contemplated only the sale of "all of Seller's right, title and interest in the Loan Documents," whatever such an interest may be, so long as defendant had the "power and authority to execute, deliver and perform this Agreement and all related documents and all the transactions contemplated hereby."

¶ 55 This conclusion is strengthened by article V of the LSA, which was entitled "Representations and Warranties of Seller." As noted, section 5.1 provided:

> "Section 5.1 Representations and Warranties by Seller. Each of the following representations and warranties by Seller is true and correct as of the date hereof and shall be true and correct on the Closing Date:
>
> (a) Authority; Binding on Seller; Enforceability. Seller is an Illinois banking company duly formed and validly existing and in good standing under the laws of the State of Illinois. Seller has taken all necessary action to authorize its execution, delivery and performance of this Agreement and has the power and authority to execute, deliver and perform this Agreement and all related documents and all the transactions contemplated hereby, including, but not limited to, the authority to sell the Loan Documents and, assuming due authorization, execution and delivery by each other party hereto, this Agreement and all the obligations of Seller hereunder are the legal, valid and binding obligations of Seller enforceable in accordance with the terms of this Agreement."

Section 5.2 provided, in bold, all-caps letters:

"Section 5.2 Loans Sold 'As Is.' Except as otherwise stated in this Agreement or the other Closing Documents delivered by Seller to Purchaser at Closing the Loan Documents are sold 'as is' and 'with all faults,' without any representation, warranty or recourse whatsoever as to either collectability, condition, fitness for any particular purpose, merchantability or any other warranty, express or implied. Seller specifically disclaims any warranty, guaranty or representation, oral or written, past or present, express or implied, concerning the Loan Documents except as provided above, the stratification or packaging of the Loan Documents, the Collateral Property or the Loan Files."

¶ 56    Plaintiff appears to believe that section 5.2 supports its argument that defendant warranted that it "owned" the notes. However, article V, read in its entirety, undercuts plaintiff's argument. The warranty in section 5.1(a) is the only warranty set forth in the LSA. Thus, pursuant to section 5.2, other than section 5.1(a)'s warranties,[4] "the Loan Documents are sold 'as is' and 'with all faults,' " including a specific disclaimer of any representation or warranty as to "collectability, condition, fitness for any particular purpose, merchantability or any other warranty, express or implied." Thus, it is clear from the language of the LSA that we may not read into the contract any representations or warranties that are not specifically listed, including a warranty that defendant holds absolute title to the notes.

¶ 57    We note that plaintiff repeatedly draws an analogy to the sale of an automobile, arguing that "[w]hether one can legally sell a car is irrelevant if one owns no car." However, this analogy does not properly describe the relationship between the parties in the context of the case at bar and merely serves to muddy the waters. Moreover, even plaintiff's automobile analogy can illustrate the flaws in plaintiff's argument. First, multiple people may have ownership interests in a single automobile—for instance, spouses may jointly own a vehicle, as may a parent and child. In that case, one individual is certainly entitled to dispose of his or her partial interest without "owning" the entire vehicle. Alternatively, one of the owners of the partial interest may have the authority from the other owners to sell the vehicle. Additionally, an automobile owner may sell her vehicle without "owning" it—if she obtained an automobile loan, the lender is named on and in possession of the certificate of title to the vehicle until the lien is satisfied (see 625 ILCS 5/3-203(a), 3-205(a) (West 2016)), but this does not prevent her from being able to sell her interest in the vehicle. Thus, plaintiff's own analogy does not add support to its argument.

¶ 58    In the case at bar, defendant alleged that it was ready, willing, and able to sell the loan documents—including the promissory notes—to plaintiff and that it had the original documents ready to be turned over to plaintiff at the closing. This is all that was required under the LSA, and there is no showing that defendant was unable to perform its obligations at the closing. Consequently, we cannot find that defendant failed to perform any conditions precedent and must find that plaintiff had no excuse for its failure to close and therefore

---

[4]Section 5.2 also includes an exception for warranties or representations made in "the other Closing Documents delivered by Seller to Purchaser at Closing." However, there is no claim that any other documents contain warranties that are applicable to the arguments raised by the parties on appeal.

forfeited its deposits.[5]

¶ 59                                CONCLUSION

¶ 60        For the reasons set forth above, the trial court properly entered summary judgment in defendant's favor because there was no excuse for plaintiff's failure to close. Therefore, plaintiff forfeited its $400,000 in deposits under the LSA.

¶ 61        Affirmed.

---

[5]We note that defendant makes an alternative argument that even if it had been required to "own" the notes, it satisfied that requirement. However, as we have found that "ownership" was not required, we have no need to address this alternate basis for affirming.