2020 IL App (2d) 190283-U
No. 2-19-0283
Order filed December 3, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| U.S. BANK NATIONAL ASSOCIATION, as Successor in Interest to Bank of America, N.A., Successor to Wells Fargo Bank, N.A., as Trustee for the Registered Holders of TIAA Seasoned Commercial Mortgage Trust 2007-C4, Commercial Mortgage Pass-Through Certificates, Series 2007-C4, | ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13-CH-12 |
| IN RETAIL FUND ALGONQUIN COMMONS, L.L.C.; IN RETAIL FUND, L.L.C.; INLAND COMMERCIAL PROPERTY MANAGEMENT, INC.; UNKNOWN OWNERS; and NON-RECORD CLAIMAINTS, | ) ) ) ) ) ) ) | |
| Defendants | ) ) | |
| (Inland Commercial Property Management, Inc., Cross-plaintiff; Jeffrey R. Anderson Real Estate, Inc., Cross-defendant; IN Retail Fund, L.L.C., Defendant-Appellant). | ) ) ) ) ) | Honorable Robert K. Villa, Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Zenoff and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court properly granted summary judgment in favor of plaintiff and against defendant on the issue of the scope and liabilities covered by defendant's guaranty.

¶ 2    Defendant, IN Retail Fund, L.L.C. (defendant or new guarantor), appeals the judgment of the circuit court of Kane County granting summary judgment in favor of plaintiff, U.S. Bank National Association, in the amount of more than $120 million. Defendant's appeal stems from the 2004 construction of the Algonquin Commons shopping center (Algonquin Commons), which was constructed and financed in two phases. In 2006, the various financing instruments were assumed by IN Retail Fund Algonquin Commons, L.C.C. (the borrower), and defendant executed a February 15, 2006, Guaranty of Payment (the new guaranty). The trial court determined, pursuant to the summary judgment proceedings, that the new guaranty encompassed both phases, leading to the judgment against defendant of over $120 million. Defendant appeals, arguing that the new guaranty is unambiguous and limits its liability solely to the Phase II indebtedness and that the trial court erred in expanding its liability under the new guaranty to encompass both Phase I and Phase II indebtedness. We affirm.

¶ 3                                  I. BACKGROUND

¶ 4    We summarize the relevant facts adduced in the record on appeal. In 2004, two adjacent parcels of property were used to construct Algonquin Commons. It was financed and constructed in two phases; upon completion of both phases, Algonquin Commons has been operated as a unitary whole with the parcels and their improvements physically congruent and connected. On October 7, 2004, the Phase I premises opened for business. On October 29, 2004, financial documents pertaining to the Phase I financing were executed. On December 16, 2004, financial documents pertaining to the Phase II financing and cross-collateralizing the real property of the

two phases were executed. The Phase II premises were constructed and, as noted, the entirety of Phase I and Phase II are operated as Algonquin Commons.

¶ 5 Turning to the specific details of the financing arrangements, Algonquin Phase I Associates, LLC, and Algonquin Commons, LLC (the original Phase I borrowers) arranged financing with Teachers Insurance and Annuity Association of America (Teachers or original lender) to support their acquisition and development of the Phase I property. The original Phase I borrowers obtained a $77.3 million mortgage loan (the Phase I Loan) and executed a promissory note (the Phase I note). On October 29, 2004, the original Phase I borrowers executed these instruments.

¶ 6 In addition, on October 29, 2004, the original Phase I borrowers executed an open-end mortgage, assignment of leases and rents, security agreement and fixture filing statement (the Phase I first mortgage) and an assignment of leases and rents (the Phase I first assignment of rents). The Phase I first mortgage encumbered the Phase I property and served to secure the Phase I note. The Phase I first assignment of rents also encumbered the Phase I property and served to secure the Phase I note. All of these instruments (collectively, the Phase I loan documents) were executed by Jeffrey Anderson, in his capacity as president of Jeffrey R. Anderson Real Estate, Inc., the authorized agent of the original Phase I borrowers. The Phase I loan documents were expressly non-recourse with respect to the original Phase I borrowers.

¶ 7 About two months after the October 7, 2004, opening of Algonquin Commons (limited, of course, to the Phase I property at that time), a separate group of borrowers sought to develop the land immediately adjacent to the Phase I property (the Phase II property). The investors developing the Phase II property included Algonquin Commons LLC (which also participated in

the Phase I construction as a member of the investors comprising the original Phase I borrowers); JRA Anderson Office Park, LLC; JRA Beechmont Twins, LLC; JRA Family Limited Liability Company; MFF Associates, LLC; TGH Associates, LLC; and Algonquin Phase II Associates LLC (collectively, the original Phase II borrowers). The original Phase II borrowers negotiated for a $21 million construction loan and other financing arrangements with Teachers to construct and develop additional retail accommodations on the Phase II property.

¶ 8 On December 16, 2004, the various financing instruments were executed by Anderson on behalf of the original Phase II borrowers. These instruments included a construction loan disbursement agreement (the Phase II loan agreement); a promissory note in the amount of $21 million (the Phase II note); a mortgage, assignment of leases and rents, security agreement and fixture filing statement (the Phase II first mortgage); and an assignment of leases and rents with respect to the Phase II premises (the Phase II first assignment of rents). By these instruments, the original Phase II borrowers also granted to Teachers a security interest in the Phase II property and a lien under the Phase II first mortgage that secured the indebtedness under the Phase II financing instruments to a maximum of $42 million (including interest, costs, attorney fees, and the like). The Phase II loan documents were expressly non-recourse with respect to the original Phase II borrowers.

¶ 9 In addition, on December 16, 2004, Teachers, the original Phase I borrowers, and the original Phase II borrowers executed "a menagerie of additional loan, guaranty, and mortgage" instruments meant to cross-collateralize and secure guaranties of payment for both the Phase I and Phase II loan agreements and mortgages. The original Phase II borrowers executed the following instruments to secure the Phase I indebtedness: (1) a guaranty of Phase I loan obligations (the

Phase I loan guaranty) in which the original Phase II borrowers guarantied to Teachers payment of the amounts owed under the Phase I note, Phase I first mortgage, and Phase I first assignment of rents, and other specified instruments in the Phase I loan documents, and the Phase I loan guaranty was expressly non-recourse with respect to the original Phase II borrowers; (2) a second mortgage, assignment of leases and rents, security agreement and fixture filing statement (the Phase II second mortgage), encumbering the Phase II property as a junior mortgage to secure the Phase I loan guaranty; and (3) a second assignment of leases and rents (the Phase II second assignment of rents) encumbering the Phase II property and securing the Phase I loan guaranty. The original Phase I borrowers executed the following instruments to secure the Phase II indebtedness: (1) a guaranty of Phase II loan obligations (the Phase II loan guaranty) in which the original Phase I borrowers guarantied to Teachers payment of the amounts owed under the Phase II note, Phase II first mortgage, Phase II first assignment of rents, and other specified instruments in the Phase II loan document, and the Phase II loan guaranty was expressly non-recourse with respect to the original Phase I borrowers; (2) a second mortgage, assignment of lease and rents, security agreement and fixture filing statement (the Phase I second mortgage), encumbering the Phase I property as a junior mortgage to secure the Phase II loan guaranty; and (3) a second assignment of leases and rents (the Phase I second assignment of rents) encumbering the Phase I property and securing the Phase II loan guaranty. Anderson executed these instruments on behalf of the original Phase I and Phase II borrowers.

¶ 10 In addition to the foregoing, on December 16, 2004, Anderson (the old guarantor), personally and in his individual capacity, executed for the benefit of Teachers a guaranty of payment (the old guaranty of payment). By its terms, the old guaranty of payment would terminate

when Algonquin Commons reached financial and occupancy thresholds, namely 95% occupancy of the rentable area of the Phase II property and rents from both the Phase I property and Phase II property reaching 1.44 times or greater than the debt service payments. In addition, the old guaranty of payment was not a non-recourse obligation; it was a personal liability of the old guarantor.

¶ 11 The record is not clear as to when the Phase II property was constructed and completed. However, the record is clear that the Phase II property was constructed with the proceeds of the Phase II loan. Further, it is clear that the Phase I and Phase II properties, when completed, were operated together as a single entity commonly known as Algonquin Commons.

¶ 12 In February 2006, the original borrowers sold Algonquin Commons, both the Phase I and Phase II properties, to IN Retail Fund Algonquin Commons, L.L.C. (the borrower), an affiliate of defendant. The sale was accomplished with respect to each phase, with the borrower assuming the obligations of the original Phase I borrowers in the loan assumption agreement dated February 15, 2006 (the Phase I loan assumption), and with the borrower assuming the obligations of the original Phase II borrowers in the loan assumption agreement dated February 15, 2006 (the Phase II loan assumption). In connection with the execution of the Phase I and Phase II loan assumption agreements, defendant was positioned as a replacement guarantor for Anderson. However, defendant did not simply step into Anderson's shoes under the old guaranty of payment. Instead, effective February 15, 2006, defendant executed a guaranty of payment (the new guaranty) that was modeled on the old guaranty of payment but contained some different provisions.

¶ 13    In section 1.1 of the new guaranty, defendant "hereby unconditionally and irrevocably guarantees to [Teachers] to pay and perform when due the Liabilities (defined below) and to pay on demand the Expenses (defined below)."  In section 1.2, the liabilities were defined as follows:

"For all purposes of this [new guaranty], the term 'Liabilities' shall mean all obligations of the Borrower to the Lender [(at the time of execution, Teachers)] of any kind whatsoever, howsoever created, arising or evidenced, whether pursuant to a covenant, representation, warranty, indemnity or other agreement of any kind, whether direct or indirect, absolute or contingent, 'recourse' or 'non-recourse', or now or hereafter existing, or due or to become due, under that certain [Phase II loan agreement] (the 'Loan Agreement'), the Note, the Mortgage or any other Loan Document.  The 'Mortgage' shall mean, collectively, (i) that certain [Phase II first mortgage], executed by [the original Phase II borrowers] for the benefit of Lender, and (ii) that certain [Phase II second mortgage], executed by [the original Phase II borrowers] for the benefit of Lender.  The 'Loan Documents' shall mean the Loan Agreement, the Mortgage, the Note, and all guaranties, security agreements and other documents defined as 'Loan Documents' under the Loan Agreement or which are furnished at any time to the Lender pursuant to the Loan Agreement.  Liabilities under the Loan Documents shall include the obligation to pay interest under the Note, including any interest at the post-maturity or default rate set forth in the Note (the 'Default Rate') (whether or not such obligations survive payment in full of the Note).  Each Guarantor acknowledges that the amount of the Liabilities may exceed the amount necessary to pay in full the Note and all Expenses.

Notwithstanding the foregoing, it is acknowledged and agreed that the obligations of the Guarantor on account of principal under the Loan shall be determined without reference to the fact that the Phase II Property also serves as collateral for the Phase I Loan.

Notwithstanding the foregoing, upon the satisfaction of all conditions to Release of Guaranty (as expressed below in Section 1.4 hereof) the Guarantor shall have no further liability under the Guaranty and this Guaranty shall be of no further force and effect. Upon request from the Guarantor, Lender shall promptly certify that the Guarantor has no further obligations under this Guaranty, if such be the case." (Underlined text in original.)

¶ 14 Section 1.3 of the new guaranty defined "expenses" as "all attorneys' fees, court costs, and other legal expenses and all other costs and expenses of any kind" which Teachers reasonably paid or incurred "in attempting to collect, compromise or enforce in any respect the Liabilities or [the new guaranty]," provided the efforts met with success. Section 1.4 defined the conditions to release the new guaranty in the same fashion as the old guaranty: 95% occupancy of the rentable area of the Phase II property and rents from both the Phase I and Phase II properties totaling 1.44 times or greater than the debt service payments. Other provisions in the new guaranty will be discussed as necessary within our analysis.

¶ 15 In 2007, Teachers transferred the loans into a trust, the TIAA Seasoned Commercial Mortgage Trust 2007-C4, Commercial Mortgage Pass-Through Certificates, Series 2007-C4. The trustee changed over time: in 2007, Wells Fargo Bank was trustee; in 2009, Wells Fargo transferred the trust to Bank of America, and effective January 2011, plaintiff became trustee.

¶ 16 In 2012, borrower ceased making its monthly payments under the loans. In December 2012, plaintiff filed suit to foreclose the mortgages and to collect the indebtedness under the

various notes and guaranties. Plaintiff included a count against defendant seeking a money judgment for breach of defendant's obligations under the new guaranty. Specifically, in the original complaint, plaintiff alleged that defendant had breached its obligations under the new guaranty and sought to recover approximately $22.5 million, which represented the amounts then due under the Phase II loans. In March 2013, plaintiff filed its first amended complaint, still seeking to foreclose the mortgages and to collect the indebtedness under the notes and guaranties. In the first amended complaint, plaintiff again alleged that defendant had breached its obligations under the new guaranty and again sought to recover approximately $22.5 million.

¶ 17   On June 3, 2014, plaintiff filed its second amended complaint in this matter, once again seeking to foreclose on the mortgages and collect the indebtedness under the notes and guaranties. In this final iteration, plaintiff once again alleged that defendant breached its obligations under the new guaranty. This time, however, plaintiff expressly alleged that the new guaranty covered both the Phase I and Phase II indebtedness. Accordingly, in its second amended complaint, plaintiff sought approximately $109.5 million, representing approximately $87 million related to the Phase I indebtedness, and approximately $22.5 million related to the Phase II indebtedness.

¶ 18   On June 25, 2014, defendant filed a motion to partially dismiss plaintiff's claim against it. Defendant alleged that, in the second amended complaint, plaintiff had changed its theory of recovery resulting in a frivolous claim seeking to recover the Phase I indebtedness under the new guaranty. Interwoven with the motion to partially dismiss, defendant also sought sanctions against plaintiff under Illinois Supreme Court Rule 137 (eff. July 1, 2013), alleging the claim for Phase I indebtedness was unfounded, contrary to the plain language of the new guaranty, and frivolous. On July 30, 2014, the trial court denied the motion to partially dismiss without prejudice and

expressly invited defendant to file a motion for partial summary judgment covering the same ground as the motion to partially dismiss.

¶ 19    On September 11, 2014, defendant accepted the trial court's invitation by filing its motion for partial summary judgment and for sanctions pursuant to Rule 137. Again, defendant argued that the new guaranty did not obligate it to pay the Phase I indebtedness. Following briefing and argument, on November 20, 2014, the trial court denied without prejudice defendant's motion for partial summary judgment.

¶ 20    In April 2015, defendant filed its motion for partial summary judgment on plaintiff's claim that it breached the new guaranty. In May 2015, plaintiff filed its motion for summary judgment, which included, along with other claims not at issue in this appeal, a request for summary judgment in its favor on its claim that defendant breached the new guaranty. Motion practice continued vigorously, and the parties engaged in discovery, following which defendant submitted parol evidence regarding the issue of the intent of the parties to the original loan documents.

¶ 21    In September 2016, both parties filed amended motions for summary judgment. Following briefing, on November 15, 2016, the trial court conducted a hearing on the motions. On December 29, 2017, the trial court denied defendant's amended motion for partial summary judgment and granted plaintiff's amended motion for summary judgment, ruling that defendant was liable for both the Phase I and Phase II indebtedness.

¶ 22    The trial court reasoned that the new guaranty included the Phase I indebtedness:

"25.    At the same time as the Phase I Loan Assumption and Phase II Loan Assumption were executed, [defendant] executed a Guaranty of Payment (the 'New

- 10 -

Guaranty of Payment'), through which [defendant] guaranteed [borrower's] then-assumed payment obligations to [Teachers].

26. Although only the Phase II Loan Assumption Agreement identifies the New Guaranty of Payment [defendant] executed, the New Guaranty expressly refers and applies to various other loan[s], mortgage[s] and [assignments of rents] between Original Borrower and [Teachers], which, objectively established guaranty obligations beyond simply the Phase II loan amount.

¶ 23 In illustrating its conclusion that the new guaranty included the Phase I indebtedness, the trial court focused on the intertwined nature of the Phase I and Phase II loans. Specifically, the court focused on the "Liabilities" section of the new guaranty (quoted above) and the documents referred to in that section. For example, the "Liabilities" section expansively defined "liabilities" as "all obligations" of the borrower to Teachers "of any kind whatsoever, howsoever created, arising or evidenced, whether pursuant to a covenant, representation, warranty, indemnity or other agreement of any kind, whether direct or indirect, absolute or contingent, 'recourse' or 'non-recourse', now or hereafter existing, or due or to become due" under the Phase II loan agreement, the Phase II note, the mortgage (which was later defined), "or any other" loan document. In turn, "mortgage" was defined to include both the Phase II first mortgage and the Phase II second mortgage. The court thus considered that the definition of "liabilities" in the new guaranty included the Phase II first and second mortgages and "each such mortgage's integrated and referenced supporting documents."

¶ 24 Continuing, the trial court identified that the Phase I and Phase II loans were ineluctably intertwined in the "Release of Guaranty" section, which acknowledged that Teachers consented to

the borrower's assumption of the Phase I loan agreement and related instruments. The court observed that, in turn, the Phase I loan was secured by the Phase II second mortgage, and that additional terms of that section further intertwined the Phase I and Phase II loans, such as the manner of calculating whether the annual rents of the entire property were 1.44 times the debt service payments for the Phase I and Phase II loans combined.

¶ 25    Narrowing its focus to the Phase II second mortgage, the trial court noted that its purpose was explained in the recitals, namely, to secure the obligations of the original Phase I borrowers under the Phase I loan agreement. As part of the Phase II second mortgage, the original Phase II borrowers provided the Phase I loan guaranty. The court observed that the Phase I loan guaranty was executed in connection with the Phase II loan, and that it served as a guaranty of "all obligations" of the original Phase I borrowers to Teachers "of any kind whatsoever, however created, arising or evidenced, whether pursuant to a covenant, representation, warranty, indemnity or other agreement of any kind, whether direct or indirect, absolute or contingent, 'recourse' or 'non-recourse', or now or hereafter existing, or due or to become due under" the Phase I loan documents.

¶ 26    Based on its construction of the new guaranty and the form of the financing transactions, the trial court made the following ruling:

> "1.    Plaintiff has demonstrated that Defendants [(meaning all defendants to the second amended complaint)] are in default, as of June 2012, under both the Phase I and Phase II loan, note and mortgage terms; having failed to make required payments since May 2012.

2. Plaintiff has demonstrated a clear right to enforce the Phase I and II loans, notes, mortgages, [assignments of rents] and guarantees, including but not limited to the [new guaranty].

3. The Phase I Loan is secured by the Phase I First Mortgage and the Phase II Second Mortgage.

4. The Phase II Loan is secured, *inter alia*, by the Phase I Second Mortgage.

5. The [original Phase II borrowers'] repayment obligations under the [Phase I guaranty] was [*sic*] secured by their December 16, 2004[,] execution of the [Phase II second mortgage].

6. Phase II Second Mortgage recitals and its Exhibit E demonstrate an indisputable guaranty of the Phase I Loan/Note obligations.

7. The different instruments executed to secure and cross-collateralize the Phase I and Phase II notes and mortgages were executed with the express intention as if part of a single, integrated transaction governing Phase I and Phase II obligations, regardless of whether they were executed simultaneously.

8. The [new guaranty] is unambiguous and does not require the consideration of [parol] evidence. Documents referenced therein ([*e.g.*,] Phase II Second Mortgage) and intended as covered under the [new guaranty] are considered integrated within the [new guaranty's] expressed obligations and are properly considered when determining the scope of its obligations.

9. The [new guaranty] unambiguously obligates [defendant] to repay all amounts owed, whether 'recourse or non-recourse' by [the original borrowers] under the Phase I

and Phase II Loan Documents that were assumed under the relevant Loan Assumption agreements and secured by, *inter alia*, the Phase II Second Mortgage. Further, the documents executed with and securing the Phase II Second Mortgage are binding upon [defendant] by way of the [new guaranty].

10. The amounts owed by [the borrower] under the [Phase I guaranty] are part of the amounts guaranteed by [defendant] under the [new guaranty].

11. The [new guaranty] has not terminated and Defendants have otherwise failed to establish the 95% Occupancy and DSCR [(debt service coverage ratio)] Test were met at any time during 2007.

12. [Defendant] has defaulted on its [new guaranty] obligations, having made no payments pursuant to said obligations.

\*\*\*

25. Plaintiffs have established that the Phase I premises and Phase II premises are co-joined and integrated parcels that comprise the 'Algonquin Commons' shopping center and, further, that the integration of such parcels to operate the Algonquin Commons shopping center was known by and intended as such by [Teachers] and all Original Borrowers. Additionally, the integrated operation of the Phase I and II parcels as the Algonquin Commons was known to and understood at the time Defendants entered into the respective Loan Assumption and [new guaranty] agreements."

¶ 27 The trial court granted summary judgment in favor of plaintiff and against defendant. The trial court's award, calculated as of May 1, 2015, totaled approximately $120.3 million.

¶ 28    On March 5, 2018, plaintiff filed a motion to adjust the amount awarded on its breach-of-guaranty claim due to the accrual of interest and for a finding of enforceability and appealability pursuant to Supreme Court Rule 304(a) (eff. Mar. 8, 2016).  On March 9, 2018, defendant filed a motion for leave to file a counterclaim, seeking to reform the new guaranty to limit it solely to the Phase II loan agreement and documents.  On April 2, 2019, the trial court granted plaintiff's motion and increased the award to approximately $136.2 million plus daily interest of approximately $26,000.  The trial court also added the requisite Rule 304(a) language regarding all matters addressed in the summary judgment order.  The trial court also denied defendant's motion for leave to file a counterclaim.

¶ 29    Defendant timely appeals.[1]

¶ 30                                II. ANALYSIS

---

[1] Defendant states that, because of its financial inability to post an appellate bond to stay the judgment during the pendency of appeal, it sought to accelerate this case under Supreme Court Rule 311 (eff. July 1, 2018), filing its brief and a supporting record in its bid to accelerate the case. Plaintiff filed an objection, and we denied the motion for accelerated review but allowed the brief to stand as well as the supporting record.  Plaintiff again objected, and we directed the parties to use the record that both had agreed upon during the pendency of the motion for accelerated review. Defendant was also required to resubmit its brief, now citing to the record on appeal.  Defendant has done so, and the record citations refer to both the record on appeal and the original proposed supporting record, now converted to a comprehensive appendix.

¶ 31    On appeal, defendant argues that the new guaranty is unambiguous and limited to the Phase II indebtedness alone, not to the full indebtedness of both phases. Defendant argues that a proper reading of the new guaranty admits only the conclusion that it was intended to be limited to the Phase II indebtedness; the trial court's judgment by contrast, was contrary to the plain meaning of the new guaranty and violated the specific principles related to interpreting guaranties. Alternatively, defendant argues that, if the new guaranty were deemed ambiguous, then the uncontroverted parol evidence demonstrates that the parties intended the new guaranty to apply to only the Phase II indebtedness. We begin with the principles guiding our review of this appeal and of the instrument at issue.

¶ 32                    A. Applicable Standards and Principles

¶ 33    Defendant argues that the trial court erred in granting summary judgment in favor of plaintiff. Summary judgment should not be granted unless the pleadings, depositions, admissions, and affidavits, if any, show that there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018). A guaranty is interpreted according to the general principles of contract construction. *Ringgold Capital IV, LLC v. Finley*, 2013 IL App (1st) 121702, ¶ 16. The interpretation of a contract presents a question of law and is therefore an appropriate subject for a motion for summary judgment. *O'Neal-Vidales v. Clark*, 2015 IL App (2d) 141248, ¶ 19. We review *de novo* the trial court's judgment on a motion for summary judgment. *Id.*

¶ 34    The interpretive standards for construing a contract are well settled. The primary objective is to ascertain and give effect to the intent of the contracting parties. *Guterman Partners Energy, LLC v. Bridgeview Bank Group*, 2018 IL App (1st) 172196, ¶ 51. In addition, every word

employed in the contract is to be given meaning, if possible. *Ramsey Herndon LLC v. Whiteside*, 2017 IL 121668, ¶ 18. The best indication of the parties' intent is the language used in the contract, given its plain and ordinary meaning. *Dearborn Maple Venture, LLC v. SCI Illinois Services, Inc.*, 2012 IL App (1st) 103513, ¶ 31. Because the meaning of the words depends on the context in which they are used, a contact must be construed as whole; the intent of the parties may not be gleaned by considering parts of the contract detached from the whole or from any provision or clause standing alone. *Id.* Where the contract is unambiguous on its face, a court will not resort to interpretive aids, such as parol evidence. *Guterman Partners Energy*, 2018 IL App (1st) 172196, ¶ 51. Thus, the unambiguous contract is enforced just as it is written. *Salce v. Saracco*, 409 Ill. App. 3d 977, 981 (2011). Ambiguity occurs where the contract language is reasonably susceptible to more than one meaning, in which case the court may resort to extrinsic evidence and other interpretive aids. *Ritacca Laser Center v. Brydges*, 2018 IL App (2d) 160989, ¶ 15. However, the parties' disagreement about the interpretation of the contract by itself does not render it ambiguous; rather, for ambiguity to occur, the language must have more than one reasonable interpretation. *Id.*

¶ 35    In addition, it is well settled that instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction are regarded as a single contract and will be construed together. *Dearborn Maple Venture*, 2012 IL App (1st) 103513, ¶ 31. However, such instruments must be construed as separate contracts where there is evidence that the parties intended for the instruments to be considered separately. *Id.*

¶ 36    There are also interpretive rules specific to guaranties. A guarantor is a favorite of the law; as such, the guarantor is given the benefit of any doubts arising from the language of the guaranty

contract. *Ringgold Capital IV*, 2013 IL App (1st) 121702, ¶ 16. Likewise, the guarantor is only liable for that which the guarantor has agreed to guaranty; thus, a court interpreting a guaranty will not extend by implication, construction, or presumption the liability beyond the precise terms of the guaranty contract. *Id.* With these principles in mind, we turn to the construction and the scope of the new guaranty.

¶ 37                                    B. The New Guaranty

¶ 38     To understand the new guaranty, we first look to the transactions that gave rise to the new guaranty, beginning with the original development of Algonquin Commons. The shopping center was developed in two phases on corresponding adjacent parcels. The financial instruments undergirding the development were symmetric and devoted to the creation of a unitary shopping center, even though they were executed over a two-month timespan. The development of the Phase I property, which opened for business before the parties executed the Phase I documents, was accomplished through the Phase I loan agreement and the Phase I note, along with the Phase I first mortgage and the Phase I first assignment of rents, all of which were designed to provide financing and security for the development of the Phase I property. Likewise, the development of the Phase II property was accomplished through the Phase II loan agreement and the Phase II note, along with the Phase II first mortgage and the Phase II first assignment of rents, again, all of which were designed to provide financing and security for the construction and development of the Phase II property. Because the intent was to develop and operate the Phase I and Phase II properties as a unitary and integrated shopping center, Teachers required the investors associated with the two phases to cross-collateralize and cross-secure each phase with the other. Thus, to secure Phase I indebtedness, the original Phase II borrowers executed the Phase I loan guaranty, the Phase II

second mortgage, and the Phase II second assignment of rents. Likewise, to secure the Phase II indebtedness, the original Phase I borrowers executed the Phase II loan guaranty, the Phase I second mortgage, and the Phase I second assignment of rents. These symmetric arrangements between the two phases fully demonstrate that, regardless of the timing of the execution of the Phase I loan documents and the Phase II loan documents, the transaction was intended to be considered as a single transaction. See *International Supply Co. v. Campbell*, 391 Ill. App. 3d 439, 448 (2009) (the court held that the four documents, entered into at the same time by the same parties and interrelated with documents referring to each other and describing some or all of the entire transaction, were intended to be read together as a single contract); *cf. Dearborn Maple Venture*, 2012 IL App (1st) 103513, ¶ 32 (three agreements constituted the parties' deal, but each agreement served a separate purpose to contribute to the overall deal between the parties).

¶ 39    Notably, the original Phase I borrowers and the original Phase II borrowers are not all the same parties. However, all the original Phase I and Phase II borrowers were related to Anderson's businesses, so that Anderson, and Anderson alone, signed all the documents on behalf of the Phase I and Phase II borrowers. We believe that, substantially, if not formally, the parties were the same even if they were separate legal entities, because of their interrelationship with Anderson and his businesses along with the fact that Anderson acted on the behalf of all of the original borrowers in his official capacity. This further confirms our conclusion that the Phase I and Phase II agreements were meant to be a single transaction.

¶ 40    On February 15, 2006, the original borrowers, with the consent of Teachers, sold the subject property to the current borrower in the series of assumption agreements. The loan assumption agreements mirrored the structure of the original Phase I and Phase II loan agreements:

the current borrower executed a Phase I loan assumption in which it assumed the original Phase I loan obligations; the current borrower also executed a Phase II loan assumption in which it assumed the original Phase II loan obligations. On the same date, February 15, 2006, defendant executed the new guaranty to provide additional security to the lender.

¶ 41    Both the Phase I and Phase II loan assumption agreements expressly stated that they were between the original borrowers, the original guarantor, the new borrower, defendant, and Teachers. The Phase II loan assumption expressly mentioned the new guaranty; the Phase I loan assumption did not mention the new guaranty. In addition, the Phase I loan assumption expressly detailed that any references in the Phase I loan documents to the original guarantor were to be understood to now refer to defendant as the new guarantor. Unlike the Phase I loan assumption, the Phase II loan assumption provided that the new borrower was executing and delivering, among other things, the new guaranty "dated as of [February 15, 2006,] executed by [defendant] for the benefit of [Teachers]." The Phase II loan assumption included the new guaranty within the definition of Phase II loan documents; the Phase I loan assumption did not include the new guaranty within the definition of the Phase I loan documents.

¶ 42    Now, the new guaranty is expressly mentioned in the Phase II loan assumption agreement and obviously applies to the Phase II agreement, as defendant concedes. The dispute arises over whether the new guaranty also applies to the obligations undertaken in the Phase I loan assumption. While the Phase I loan assumption agreement does not directly reference the new guaranty, we note it does directly refer to defendant. Significantly, in the new guaranty's opening paragraph, entitled "Loan Assumption Agreement," defendant is expressly referenced as the "New Guarantor." Equally significant, defendant is a separate signatory to the Phase I assumption

agreement, and defendant executed the Phase I assumption agreement as the "New Guarantor." Defendant's contention that the new guaranty does not apply to the Phase I obligations because the new guaranty is not specifically referenced is belied by the inclusion of defendant within the Phase I loan assumption agreement in its role as the new guarantor.

¶ 43    To determine the scope of defendant's obligations under the Phase I loan assumption agreement, we turn to the new guaranty itself.   In the new guaranty, defendant agreed to "unconditionally and irrevocably" guaranty to [plaintiff] to "pay and perform when due the Liabilities" defined in the new guaranty and "to pay on demand the Expenses" defined in the new guaranty.   In turn, the new guaranty defines "Liabilities" to mean:

> "all obligations of [the current borrower] to the Lender of any kind whatsoever, howsoever created, arising or evidenced, whether pursuant to a covenant, representation, warranty, indemnity or other agreement of any kind, whether direct or indirect, absolute or contingent, 'recourse' or 'non-recourse', or now or hereafter existing, or due or to become due, under [the Phase II loan agreement], the Note, the Mortgage or any other Loan Document."

¶ 44    The language employed is unambiguous.  However, the capitalized terms (and the replaced term) are defined, either within the new guaranty itself, or by reference to other contracts comprising the transaction.  Accordingly, to ascertain the parties' intent, we must work through the definitions of the capitalized terms.

¶ 45    Beginning with the "Guarantor's Agreement" section in the new guaranty, defendant agreed "to pay and perform when due the Liabilities" as defined within the new guaranty.  In turn, "Liabilities" is defined in the new guaranty to mean "all obligations" of the current borrower.  The

payment obligations of the current borrower to defendant are defined to be "of any kind whatsoever, howsoever created, arising or evidenced, whether pursuant to a covenant, representation, warranty, indemnity, or any other agreement of any kind, whether direct or indirect, absolute or contingent, 'recourse' or 'non-recourse', or now or hereafter existing, or due or to become due." We conclude, therefore, that defendant's payment obligations under the new guaranty are comprehensive and coextensive with all the current borrower's payment obligations to plaintiff.

¶ 46    Defendant's payment obligations are limited, however, to the four categories specified in the definition of liabilities in the new guaranty, namely the obligations arising "under [the Phase II loan agreement], the Note, the Mortgage or any other Loan Document." The Phase II loan agreement was expressly spelled out in the sentence delineating the categories; the other three terms were defined in other provisions or elsewhere in the "Liabilities" section of the new guaranty. "Note" was elsewhere defined to be the Phase II note. "Mortgage" was defined to include both the Phase II first mortgage and the Phase II second mortgage.[2] The fourth, catch-all

---

[2] That it is the Phase II second mortgage must be inferred, because both second mortgages were executed on December 16, 2004. That it is the Phase II second mortgage and not the Phase I second mortgage that is intended in the new guaranty's definition of "Mortgage" is because the second mortgage was "executed by Prior Owner," and "Prior Owner" is defined in the new guaranty as the original Phase II borrowers. The second mortgage executed by the original Phase II borrowers is the Phase II second mortgage; the original Phase I borrowers executed the Phase I second mortgage.

category, "any other Loan Document," is defined to mean the Phase II loan agreement, the "Mortgage" (meaning the Phase II first mortgage and the Phase II second mortgage), the Phase II note, "and all guaranties, security agreements and other documents defined as 'Loan Documents' under the [Phase II loan agreement] or which [were] furnished at any time to the Lender pursuant to the [Phase II loan agreement]."

¶ 47    In turn, the Phase II loan agreement defines "Loan Documents" to include "each of the Phase I Guaranty Documents together with any other document now or hereafter evidencing, securing, guarantying or otherwise relating to the Loan." The "Phase I Guaranty Documents" are defined to include the Phase I loan guaranty and the Phase II second mortgage. The Phase I loan guaranty was an undertaking by the original Phase II borrowers in which they guarantied to the lender payment of the amounts owed under the Phase I note, the Phase I first mortgage, the Phase I first assignment of rents, and other specified instruments. Thus, the Phase I loan guaranty is included in defendant's obligations under the new guaranty under the category of "any other Loan Document," and it reaches the borrower's indebtedness under the Phase I loan agreement, note, and first mortgage. Although it is circuitous, the terms are all expressly and unambiguously defined, and the result is clear: the new guaranty encompasses both the Phase I and Phase II indebtedness.

¶ 48    Continuing, when we look specifically at the Phase I loan guaranty, the original Phase II borrowers guarantied the liabilities which were defined therein. The Phase I loan guaranty defined the liabilities to be:

> "all obligations of [the original Phase I borrower] to the Lender of any kind whatsoever, howsoever created, arising or evidenced, whether pursuant to a covenant, representation,

warranty, indemnity or other agreement of any kind, whether direct or indirect, absolute or contingent, 'recourse' or non-recourse', or now or hereafter existing, or due or to become due under the Phase I Loan Documents."

In turn, the "Phase I Loan Documents" were defined as all instruments and documents evidencing or securing the Phase I loan, including the Phase I note, the Phase I first mortgage, and the Phase I first assignment of rents, as well as other enumerated instruments. Thus, the Phase I loan guaranty obligated the original Phase II borrowers to pay the Phase I indebtedness arising from the Phase I loan agreement and "Phase I Loan Documents."

¶ 49    Again, while circuitous, these provisions obligate the original Phase II borrowers to pay the Phase I indebtedness. In turn, because the new guaranty uses the definitions provided in the Phase II and Phase I loan documents, the new guarantor, namely, defendant, is obligated, under the term "any other Loan Document" to pay the Phase I indebtedness along with the Phase II indebtedness if the current borrower under the Phase I and Phase II assumption agreements were to be unable to pay them.

¶ 50    These results come about by the simple replacement of the defined terms with their equivalents as they have been defined in the various instruments defining the transaction and referenced by the definitions. The language employed in the provisions is clear and unambiguous, and we are not venturing beyond the instruments either contemporaneously executed or expressly identified as the source of the definition. It is clear that "any other Loan Document" includes instruments evidencing the borrower's (and thus the guarantor's) liability for the Phase I indebtedness. We therefore hold that the new guaranty is unambiguous, and it includes in its scope the obligations under both Phase I and Phase II. Accordingly, we hold that the trial court correctly

interpreted the new guaranty and its scope, and it correctly granted summary judgment in favor of plaintiff and against defendant on that issue.

¶ 51                                    C. Defendant's Arguments

¶ 52    Defendant fundamentally argues that the new guaranty unambiguously limits its liability to only the Phase II indebtedness, and this fundamental contention motivates all of its various contentions. Before taking up these contentions, we make the initial observation that, both in the statement of facts and in an alternative argument, defendant includes a summary and analysis of parol evidence purporting to demonstrate the intent of the original parties, including the original guarantor. However, extrinsic evidence is not cognizable unless the contract is ambiguous. *Guterman Partners Energy*, 2018 IL App (1st) 172196, ¶ 51. Because the new guaranty (and the other instruments as well) is not ambiguous, we take no notice of the extrinsic evidence or any argument based on the extrinsic evidence. Defendant includes several pages recounting this extrinsic evidence in its statement of facts. The extrinsic evidence of the parties' intent is blandly interwoven into the statement of facts and purports to be an uncontroverted fact rejected by the trial court in rendering summary judgment rather than being segregated and only presented to support defendant's alternative argument that, if the new guaranty were deemed ambiguous, then the extrinsic evidence could be used in resolving the parties' intent. We understand defendant's rhetorical impetus to "get its story out there," but its method is nonetheless problematic. Defendant is obligated under our supreme court's rules to state "the facts necessary to an understanding of the case," and to state them "accurately and fairly without argument or comment." Ill. S. Ct. R. 341(h)(6) (eff. May 25, 2018). Interjecting evidence that is not relevant without explanation or demarcation cannot be deemed a fair or accurate presentation of the necessary facts.

¶ 53    Turning to its specific contentions, defendant argues that the new guaranty defines all the loan documents in terms of the Phase II loan. As we have noted, this is not correct. The new guaranty expressly refers to "any other Loan Document," and that term is defined in the Phase II agreement, which provides that "Loan Documents" include "each of the Phase I Guaranty Documents." In turn, the "Phase I Guaranty Documents" include the Phase I guaranty. The Phase I guaranty defines the liabilities of the original Phase I borrowers to be "all obligations of the [original Phase I borrowers] to the Lender of any kind whatsoever, *** whether direct or indirect, absolute or contingent, 'recourse' or 'non-recourse' ". Thus, the category of "any other Loan Document" in the new guaranty specifically includes the obligations under the original Phase I agreement. Defendant's contrary contention ignores how "any other Loan Document" in the new guaranty includes the Phase I obligations and fails to explain how, in light of that inclusion, the new guaranty covers only the obligations of the Phase II loan agreement.

¶ 54    Defendant also suggests that the new guaranty would have used the plural "Notes" in defining liabilities if it had been intended to cover the Phase I and Phase II notes. This is a misreading of the provision. The new guaranty defines the liabilities of the new guarantor (defendant) to be "all obligations of the [new borrower] of any kind whatsoever," and encompassed by the following four categories: "[the Phase II loan agreement], the [Phase II] Note, the [Phase II] Mortgage or any other Loan Document." Defendant initially argued that the new guaranty did not encompass the Phase I indebtedness because the four categories referred to Phase II indebtedness. In the very next paragraph, defendant argues that, if the new guaranty were intended to include the Phase I indebtedness, then notwithstanding how the parties defined the four categories, the term "Note" should have been "Notes" if the new guarantor's obligations were

intended to encompass both the Phase I and Phase II indebtedness. Defendant's initial observation was correct: the "Note" category referred only to the Phase II note. The Phase I obligations were reached through the fourth category, "any other Loan Document," in which the obligations arising under the Phase I note (among others) were included. While the new guaranty is perhaps not a model of drafting clarity, and while it might have been more desirable to spell out each possible obligation in painstaking detail, the drafting choices made in the new guaranty do not render it ambiguous or of uncertain import. We reject defendant's contention.

¶ 55    Defendant also argues that the new guaranty's limitation to Phase II indebtedness is demonstrated by the fact that the section entitled "[New] Guarantor's Agreement" provides only that defendant "acknowledges that the Lender has given sufficient consideration for this [new guaranty] by agreeing to consent to the assumption by [new borrower] of that certain [Phase II] loan to [the original Phase II borrowers]." Defendant contends that, had the new guaranty been intended to cover obligations arising from the Phase I indebtedness, then the new guaranty would have also noted that part of the consideration was the lender's agreement to consent to the assumption by the new borrower of the Phase I loan as well. The adequacy of the consideration does not affect the definition of liabilities. Similarly, defendant argues that one of its representations to Teachers in the body of the new guaranty was that "[defendant] is deriving a material financial benefit from the assumption of the [Phase II] Loan by the [the new borrower]." Defendant contends that, had the new guaranty been intended to encompass the Phase I indebtedness, then it would have represented that it was also deriving a material financial benefit from the assumption of the Phase I loan agreement. Any financial benefit derived by defendant does not affect the liabilities encompassed in the new guaranty.

¶ 56    Defendant argues that the clincher in this line of reasoning is the provision stating that the new guaranty would remain in "full force and effect until *** (c) the [Phase II] Loan has been repaid in full." Defendant's "clincher" actually unwinds the foregoing argument instead of clinching it because defendant omitted parts of the provision for the sake of its argument. The provision states, in full and relevant portion:

"this [new guaranty] shall in all respects be a continuing guaranty, remaining in full force and effect until all of the following have occurred: (a) all of the Liabilities have been satisfied in full, (b) all of [defendant's] obligations hereunder have been satisfied and full, and (c) the [Phase II] Loan has been repaid in full."

In making this purported clinching argument, defendant wholly omits the requirement that "all of the Liabilities [established in the new guaranty were required to] have been satisfied in full." Because "Liabilities" includes the Phase I indebtedness, the liabilities under the new guaranty could not be satisfied in full unless the Phase I loan were also repaid in full. Defendant's "clincher" fails to convince because it misleadingly omits language from the provision to support its appellate position.

¶ 57    In addition, defendant's clincher is based on the assertion that the new guaranty contemplates only the Phase II loan and indebtedness. This assertion is belied by the new guaranty's "Release of Guaranty" section. First, the release provision expressly acknowledges that the lender consented to the new borrower's assumption of the Phase I loan and indebtedness (including, expressly, the Phase I mortgage, the Phase I note, the Phase I second mortgage and all of the other previously noted Phase I Loan Documents discussed above). The release provision also sets forth the calculations required to determine if the occupancy and cash-flow conditions

have been satisfied in order to trigger the release of the new guaranty. The release provision expressly requires that the Phase I and Phase II properties be considered together; likewise, the debt service payments must be calculated "with reference to the Phase I Loan and the [Phase II] Loan combined." Thus, when read in full, the "Release of Guaranty" section simply does not support defendant's "clincher."

¶ 58    Defendant, somewhat disorganizedly, refocuses on the "Liabilities" section of the new guaranty. Defendant reasserts that the new guaranty "would have expressly mentioned the Phase I Note, instead of just the Phase II Note, if it encompassed both Notes." As we have seen above from the definitions of all the terms employed, the Phase I note and indebtedness are included in the "any other Loan Document" category. In other words, the "any other Loan Document" category includes the Phase I note (among others). Defendant also purports to infer that, by construing the liabilities defined by the new guaranty to include the Phase I indebtedness, its liability as guarantor is being "varied or extended by construction or implication beyond its precise terms," citing *McLean County Bank v. Brokaw*, 119 Ill. 2d 405, 412 (1988). However, this is plainly wrong. By construing the terms according to the definitions employed by all the coordinate agreements in the transaction, we are actually fleshing out the precise terms employed in the guaranty and holding defendant to the liability unambiguously contemplated in the new guaranty. Accordingly, we reject defendant's contention.

¶ 59    Defendant next contends that the express mention of the Phase I loan occurring in the "liabilities" section of the new guaranty pertains only to the cross-collateralization of the two phases and cannot be used to impose liability for the Phase I indebtedness under the new guaranty. The passage states: "Notwithstanding the foregoing, it is acknowledged and agreed that the

obligations of [defendant] on account of principle under the [Phase II] Loan shall be determined without reference to the fact that the Phase II Property also serves as collateral for the Phase I Loan." Defendant assumes, without actually demonstrating, that the only reason liability for Phase I indebtedness was imposed under the new guaranty was this express mention of the Phase I Loan in the quoted sentence. However, as we have seen above, the Phase I indebtedness is brought within the new guaranty's obligations under the "any other Loan Document" category of the passage defining liabilities. Thus, the cross-collateralization exception does not serve as the vehicle to impose liability for the Phase I indebtedness, and defendant's argument is little more than a straw man.

¶ 60    Defendant next argues that the section setting forth the actions the lender may take without affecting defendant's obligations under the new guaranty illustrates that the new guaranty "is limited to payment obligations under the Phase II Loan." The section provides a list of actions the lender may take "without in any way affecting the obligations of any Guarantor," and the actions generally apply to the Phase II loan agreement. The final item states that the lender may also take "any of the foregoing actions with respect to the Phase I Loan or the Phase I Loan Documents." Defendant argues that the "authorization to take actions with respect to the Phase I Loan or Phase I Loan Documents would be superfluous if the 'Liabilities' secured by the [new guaranty] include indebtedness under the Phase I Loan" because if the Phase I indebtedness was included, it would not be necessary to include a reference to the Phase I loan. We disagree. The listed actions were listed expressly with respect to the Phase II loan and Phase II indebtedness. The Phase I loan and the Phase I indebtedness are not included in the Phase II loan and indebtedness; that is the reason there is a Phase I and a Phase II. However, the Phase I and Phase II indebtedness is included in

the new guaranty, and expressly extending the allowed actions to the Phase I and Phase II loans and indebtedness emphasizes that the actions are applicable to each.

¶ 61    Defendant attempts to buttress this contention, that the new guaranty "is limited to payment obligations under the Phase II Loan," by referring to defendant's non-recourse carve-out guaranty. According to defendant, the equivalent section setting forth the actions the lender may take without affecting defendant's obligations under the non-recourse carve-out guaranty omits the item that refers to Phase I because the non-recourse carve-out guaranty refers only to Phase I. Defendant's contention is exactly backwards. Indeed, if the reason the non-recourse carve-out guaranty did not refer to Phase I was because it covers only Phase I indebtedness, then the inclusion of a provision in the new guaranty expressly referencing Phase I strongly implies that it was not covered by the language expressly referring to Phase II. Thus, by including the reference to the "Phase I Loan or the Phase I Loan Documents," the parties clearly indicated the intent in the new guaranty that the lender was allowed to take the same actions with respect to both the Phase I and Phase II loans. Defendant's analogy to the non-recourse carve-out guaranty fails because that guaranty applies only to the Phase I indebtedness and the section setting forth the lender's allowed actions was couched in terms of the Phase I loan and indebtedness. If, as defendant argues, the new guaranty applied only to the Phase II loan and indebtedness, then the new guaranty would not have included language extending the lender's actions to "the Phase I Loan or the Phase I Loan Documents." Properly viewed, then, defendant's argument on this point is precisely backwards, and the structure of the section implies that the new guaranty covers both the Phase I and Phase II indebtedness.

¶ 62    Defendant next argues that the trial court's judgment was incorrect because it failed to read the guaranty as a whole, and instead, considered certain sections in isolation without explaining

how several sections were not rendered superfluous under the interpretation that the new guaranty applied to both the Phase I and Phase II indebtedness. Defendant points to three sections of the new guaranty to illustrate its argument: the "[New] Guarantor's Agreement" section, the section concerning defendant's financial benefit, and the "Continuing Guaranty" section. According to defendant, each of those three sections expressly discuss the Phase II loan, not the Phase I loan; defendant argues that, in turn, the "Liabilities" section and the "Certain Permitted Actions of the Lender" section would be rendered superfluous if the new guaranty included the Phase I and Phase II indebtedness. We disagree.

¶ 63    We have discussed the three sections that expressly refer to the Phase II loan previously. The "[New] Guarantor's Agreement" section obligates defendant "to pay and perform when due the Liabilities (defined [in the next section of the new guaranty])." The "Liabilities," therefore, is the focus of the agreement between defendant and Teachers in this section. The reference to the Phase II Loan arises in the context of an acknowledgement of the sufficiency of the lender's consideration. The acknowledgement of consideration is thus incidental to the point of this section of the new guaranty. Moreover, the fact that defendant has promised to pay and perform the liabilities arising under the new guaranty necessarily includes both the Phase I and Phase II loans and indebtedness because both are encompassed by the defined term, "Liabilities."

¶ 64    The next section is defendant's representation to Teachers that it "is deriving a material financial benefit from the assumption of the [Phase II] Loan by [the new borrower]," which is a company related to defendant. The purpose of this section is to demonstrate that the new guaranty is not a contract of adhesion and that consideration is adequate. The fact that it does not mention Phase I expressly in this section does not change the nature of defendant's representation.

¶ 65    The third section is the "Continuing Guaranty" which defendant misrepresented through selective quotation.  The section expressly refers to the requirement that the new guaranty will continue in full force and effect until, among other things, the liabilities imposed under the new guaranty have been satisfied in full.  By referencing the liabilities under the new guaranty, this section necessarily references both the Phase I and Phase II loans and indebtedness.

¶ 66    Defendant essentially reads (or misreads) these sections in isolation yet purports to make the point that a contract must be read in its entirety and must be interpreted to give effect to each and every term of the contract.  Despite this flaw in its reasoning, defendant's point is not that the three sections do not expressly mention the Phase I loan and indebtedness, but instead that, based on its construction of the three sections, two other sections, the "Liabilities" and the "Certain Permitted Actions of the Lender" sections, are superfluous.  Again, we have discussed the import of these sections above, but not specifically in reference to the three sections that purportedly render them "superfluous."  The "Liabilities" section specifically defines the liabilities covered under the new guaranty in terms of both the Phase I and Phase II loans and indebtedness.  Likewise, the "[New] Guarantor's Agreement" and "Continuing Guaranty" sections specifically refer to the defined liabilities, so they cannot render the "Liabilities" section superfluous; indeed, they help give it effect.  The "Financial Benefit to [Defendant]" section deals with consideration and conscionability, so the omission of a direct or indirect reference to the Phase I indebtedness is of little moment in evaluating the agreement as a whole.  Indeed, to accept defendant's premise would almost necessarily require each section, subsection, provision, clause, and phrase to include an express reference to the Phase I loans and indebtedness and the Phase II loans and indebtedness— an unsupportable proposition that would only obscure the parties' intent in entering into this

agreement. Similarly, the "Certain Permitted Actions of the Lender" section also specifically sets forth the original seven enumerated classes of Teachers' permitted actions in reference to the Phase II loan and indebtedness. In the eighth enumeration, the "any of the foregoing actions with respect to the Phase I Loan or the Phase I Loan Documents" enumeration, it expressly includes the Phase I loan in the actions Teachers is permitted to take. Thus, again, contrary to defendant's interpretation, this section expressly covers both the Phase I and Phase II loans and can scarcely be deemed superfluous even in relation to the "[New] Guarantor's Agreement," the "Financial Benefit to [Defendant]," and "Continuing Guaranty" sections. Defendant's contention remains unpersuasive.

¶ 67    Defendant next focuses on the trial court's construction of the "Release of Guaranty" section, contending first that the trial court's interpretation is a legal conclusion and, as such, has no place in the "Findings of Fact" portion of the trial court's judgment. The interpretation of an unambiguous contract is, of course, a legal, not factual, question. *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill. 2d 440, 447 (1991). The trial court's inclusion of a legal conclusion within the "Findings of Fact" portion is, strictly speaking, incorrect. That does not, of course, require reversal because we consider the trial court's judgment, not its reasoning in conducting our review. *Republic Bancorp Co. v. Beard*, 2018 IL App (2d) 170350, ¶ 26. Whether the legal conclusion was misplaced in the factual findings also does not alter the nature of the conclusion and whether it was proper in light of the clear and unambiguous language of the new guaranty.

¶ 68    In defendant's view, the express references to the Phase I loan in the "Release of Guaranty" section show only that, where the parties intended to refer to the Phase I loan, they did so expressly. Defendant concludes that, because the "Liabilities" section did not expressly reference the Phase

I loan and indebtedness, then the "Release of Guaranty" and "Certain Permitted Actions of the Lender" sections, which expressly mentioned the Phase I loan, suggest that the "Liabilities" section was intended to cover only the Phase II loan and indebtedness. Again, we have carefully considered the meaning of the terms employed in the "Liabilities" section and have concluded above that it refers to both the Phase I and Phase II loan and indebtedness. The "Release of Guaranty" section expressly provided that both the Phase I and Phase II loan had to be considered in the release calculations, and this supports the conclusion that the new guaranty involved both the Phase I and Phase II loans. Likewise, the "Certain Permitted Actions of the Lender" section also details the actions the lender is allowed to undertake regarding the Phase I and Phase II loans, and, as seen above, it supports the idea that, if the Phase I loan had not been expressly mentioned, then the lender could have taken the allowed actions only with regard to the expressly specified Phase II loan; likewise, it further reveals the intent of the parties to include both loans in the new guaranty. Accordingly, we reject defendant's contention.

¶ 69 Next defendant focuses on the "Liabilities" section and asserts that the inclusion of the Phase II second mortgage is the only reason for the trial court's conclusion that the new guaranty applied to the Phase I and Phase II loans and indebtedness. Whether this is a fair and accurate reading of the trial court's reasoning is beside the point because we review the trial court's judgment, not its reasoning. *Republic Bancorp*, 2018 IL App (2d) 170350, ¶ 26. Thus, whether the trial court based its construction on the presence of the Phase II second mortgage, which provided security for the Phase I indebtedness does not matter to our review if the trial court reached the correct result, even by using incorrect reasoning. *Id.* The balance of defendant's argument on this point is spent in attacks on the trial court cloaked in appeals to reason (*e.g.*,

"tortuous reading of the loan documents," "cryptic and convoluted fashion [to include the Phase I indebtedness]," etc.). We find defendant's contention unpersuasive.

¶ 70    Next, defendant contends that the Phase I loan guaranty, in which the original Phase II borrowers entered into a guaranty of "all obligations of the [original Phase I borrowers]" under "the Phase I Loan Documents," does not constitute an obligation under the new guaranty. Defendant relies on the "Limitation" section of the Phase I loan guaranty, which provides that, notwithstanding the Phase I loan guaranty's definition of liabilities, "nothing in [the Phase I loan guaranty] shall be construed as creating any liability on the part of the [original Phase II borrowers] to personally pay any such indebtedness or any interest that may accrue thereon," because "all such personal liability, if any," is "expressly waived by [Teachers]" and any successors or assigns. Instead, "[f]or recovery under [the Phase I loan guaranty], [Teachers] shall look solely to the interest of [the original Phase II borrowers] in the [Phase II property]." According to defendant, this limitation provision negates "any payment obligation" under the Phase I loan guaranty. We disagree.

¶ 71    The limitation provision only limits the personal liability of the original Phase II borrowers, not the obligation to pay. Thus, defendant's contention subtly shifts the emphasis from "liability on the part of [the original Phase II borrowers]" and "all such personal liability, if any, being expressly waived" by Teachers or its successors or assigns, to any payment obligation.[3] This shift of emphasis is integral to defendant's argument, but it misrepresents the purpose of the

---

    [3] We note that "any payment obligation" is defendant's characterization from its brief, not from any of the loan documents.

"Limitation" section, which expressly makes non-recourse the liability undertaken by the original

Phase II borrowers as guarantors under this agreement. Thus, the "Limitation" section serves only

to make the Phase I loan guaranty a non-recourse guaranty rather than a personal guaranty, and it

limits Teachers' or the current lender's remedy to foreclosing on the Phase II property.

¶ 72    Defendant then looks to the Phase II note as an example of an unconditional obligation

(indeed, the Phase II note states that "the obligation of [the original Phase II borrowers] is absolute

and unconditional"). The problem with the comparison between the two documents is that the

"Limitation" section of the Phase I loan guaranty does not speak in terms of obligation; rather, it

expressly negatives the personal liability of the original Phase II borrowers and mandates that any

remedy under the Phase I loan guaranty must be the foreclosure of the original Phase II borrowers'

interest in the Phase II property. Defendant's argument remains unconvincing.

¶ 73    Defendant next argues that any reliance on the cross-guaranties in support of applying the

new guaranty to the Phase I loan assumption is misplaced because the cross-guaranties are

rendered nugatory to the extent they have been assumed by a single borrower. See *International

Supply Co. v. Campbell*, 391 Ill. App 3d 439, 448-450 (1986) (a guaranty is an agreement between

a guarantor and a creditor wherein the guarantor agrees to be secondarily liable to the creditor for

a debt or obligation owed to the creditor by a third party, namely, the debtor). Initially, we note

that the cross-guaranties are not guaranties in the same sense as the guaranties in *International

Supply* because they are non-recourse in nature. Further, even if we were to fine the rationale of

*International Supply* applicable to the cross-guaranties in this case, it would invalidate the

characterization of the agreement as a guaranty, not the agreement itself, which should still be

given whatever force and effect is possible. See *id.* at 449-50 (the contract at issue did not conform

to the form of a guaranty and the obligations under the purported guaranty would be considered as obligations assessed according to the general principles of contract interpretation and not as a separate obligation). Thus, if the current borrower's assumption of the cross-guaranties embodied in the Phase I loan guaranty and the Phase II loan guaranty rendered each incognizable as a guaranty, it did not mean that the contracts themselves were not enforceable.

¶ 74 Defendant attempts to avoid this result by contending that an agreement to perform a preexisting contractual obligation cannot constitute sufficient consideration for a guaranty agreement. See *American National Bank of Champaign v. Warner*, 127 Ill. App. 3d 203, 207 (1984). However, the insufficiency of consideration simply means that we may not consider the agreement a "guaranty," not that there is simply no agreement whatsoever. Indeed, Teachers provided sufficient consideration in acquiescing to the assumption by the current borrower of the Phase I and Phase II loan documents, including the Phase I loan guaranty and the Phase II loan guaranty. Thus, there is adequate consideration to support the agreement even if it may not be sufficient to be able to deem each of the cross-guaranties a "guaranty." Because the agreements are still valid contracts between the current borrower and plaintiff (even if not "guaranties"), the terms therein may still be given force and effect. Because the terms and definitions in these loan documents supply meaning to the terms used in the new guaranty and the Phase I and Phase II loan guaranties are still valid agreements, we may still utilize these loan documents to inform our understanding of the new guaranty. Accordingly, we reject defendant's contention.

¶ 75 Defendant concludes its series of arguments by asserting that "the only reasonable interpretation" of the new guaranty limits its liability to the Phase II indebtedness alone. Because we rejected each of defendant's specific contentions, we also disagree that the new guaranty is

limited to the Phase II indebtedness alone. As we have discussed above, the new guaranty covers both the Phase I and Phase II indebtedness together.

¶ 76     Finally, defendant devotes several pages of its brief to the consideration of parol evidence from Anderson and an employee of Teachers regarding the purported intent of the original parties to the Phase I and Phase II loan documents. However, because the new guaranty is unambiguous, we do not resort to the consideration of parol evidence. *Guterman Partners Energy*, 2018 IL App (1st) 172196, ¶ 51. Accordingly, we need not and do not address defendant's contentions based on the parol evidence from Anderson and the employee from Teachers.

¶ 77                                 III. CONCLUSION

¶ 78     For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

¶ 79     Affirmed.